## Cecelia Cassell, Appellant, *v.* W. B. Crothers.

193    359
22 SC ¹326

*Lease—Oil and gas lease—Tenancy at will—Termination of lease.*

In an oil lease for a fixed period and " as long thereafter as oil is found in paying quantities," where the lessor's compensation is one eighth of the oil produced, the tenancy as to the surface of the land, after the expiration of the fixed period, and after the fact that oil is not being found and produced in paying quantities becomes susceptible of proof, is a tenancy in the nature of a tenancy at will, and if not actually terminated by mutual consent, or continued by mutual consent in order that further exploration be made, may be terminated by either party.

*Lease—Oil and gas lease—Termination of lease.*

Where a lessor terminates an oil and gas lease and takes possession of the premises and of certain personal property claimed by the lessee, the latter cannot maintain an ejectment to obtain possession of the premises in order to remove the personal property, but the court will direct judgment in the ejectment in favor of the lessor without prejudice to the lessee's right to maintain an action against the lessor for taking and appropriating the personal property of the lessee.

Argued Oct. 17, 1899. Appeal, No. 176, Oct. T., 1899, by plaintiff, from judgment of C. P. Washington Co., Nov. T., 1898, No. 38, on trial by the court without a jury. Before STERRETT, C. J., GREEN, MCCOLLUM, MITCHELL, DEAN and FELL, JJ. Affirmed.

Ejectment for a leasehold in Buffalo township.

Trial by the court without a jury.

MCILVAINE, P. J., filed the following opinion:

FACTS FOUND.

1. On April 22, 1887, W. B. Crothers, the defendant, leased his farm in Buffalo township in this county, containing ninety-six acres, more or less, to the Marshall Oil Company, "its successors and assigns, . . . . for the sole and only purpose of drilling and operating for petroleum oil and gas for the term of ten years and as long thereafter as oil or gas is found in the land herein described in paying quantities," with the right "to remove at any time any and all machinery, oil well supplies or appurtenances and property of any kind to said party of the second part belonging or by it placed on said premises. . . . . In consideration of said lease . . . . the said party of the second part" agreed "to pay to said party of the first part five hundred dollars annually for each gas well from the time said gas is conducted and used or sold off of said premises". . . . and "in further consideration of said lease". . . . "the party of the second part" agreed "to deliver to said party of the first part the one-eighth of all the oil produced and saved from said premises and to deliver the same to a pipe line for the said party of the first part."

2. The rights of the Marshall Oil Company by assignments were transferred and vested in Cecelia Cassell on March 18,

1891, and were held by her from that date until the bringing of this action.

3. A number of wells were drilled on this farm under this lease shortly after its execution, and oil but not gas was found in paying quantities. The term of the lease (ten years) expired on April 22, 1897, and at that time there were five wells that had been or were being pumped for oil. On July 1, 1897, four wells were producing oil, and on November 14, 1897, only three. On the last named day all the oil in the tanks was run into the pipe line, all the wells were shut down, and the loose tools were locked up, and the employees in charge of the lease left it and none of them returned, except as hereinafter stated. At the time the wells were thus shut down they were making, in all, about one or two barrels of oil per day, and were not at that time producing oil in paying quantities, a production of eight or ten barrels per day being necessary before it could be said that the premises leased were producing oil in paying quantities. The wells were shut down and left, as we have indicated, by the field manager in pursuance of directions received from the attorneys in fact of Cecelia Cassell, the plaintiff, which directions were contained in the following letter:

"NEW YORK, Nov. 9, 1897.

"T. E. SLOAN,

"Taylorstown, Pa.

"Dear Sir: In reply to yours of November 8th would say, that we have recently written Mr. Malick to instruct you to shut down the Blayney well and the W. B. Crothers farm for the winter. It is not our intention to clean out any wells in that section before next spring. Our Mr. Malick will see you soon, as he intends to make a trip to Taylorstown shortly.

"Yours truly,

"BETTMAN, WATSON & BERNHEIMER."

These people controlled a number of wells in this "section" beside those on the Crothers farm, some of which were not shut down.

4. Some time in April, 1898, W. B. Crothers, the defendant, entered and took possession of all the wells and property of the plaintiff, including boilers, engines, steam pipe, sucker rods,

tools, etc., claiming that the term of the lease had ended and that the leased premises and everything found thereon belonged to him. He shot and cleaned out some of the wells, rebuilt some of the rigs and repaired some of the machinery, and by the 1st of July, 1898, was producing oil in paying quantities, to wit: eight or ten barrels per day. On May 15 or 16, 1898, the plaintiff, knowing what the defendant had done, sent an employee to take charge of her wells on this farm, who was ordered off and threatened with arrest by the defendant—he, in justification of his action, claiming that the plaintiff had no longer any rights under the lease of date April 22, 1887. Between November 14, 1897, when the wells were shut down, and May 15 or 16, 1898, when this employee made his appearance, no one in behalf of the plaintiff had done anything upon the leased premises. On August 24, 1898, this action of ejectment was brought to recover possession of this tract of land for oil and gas purposes.

### CONCLUSION.

From the foregoing facts we hold as follows:

1. The plaintiff did not abandon her rights under the lease.

2. The plaintiff did not forfeit her rights under the lease; but,

3. The period for which she held under the lease, on November 14, 1897, became subject to termination, as oil or gas was not being produced in paying quantities, and that the defendant on April 1, 1898, had a right to re-enter to determine it.

4. This did not give him the right, eo instanti, to take and convert to his own use the plaintiff's personal property found upon the lease or such fixtures as she had not had, after notice, a reasonable time to remove.

5. The plaintiff's remedy against the defendant for taking and appropriating any personal property or fixtures which she had a right to remove is not an action of ejectment.

### HOW THE COURT ARRIVED AT ITS CONCLUSIONS.

A lessee's rights under an oil lease may be terminated by "abandonment," by "forfeiture" and by "expiration of the term" for which the lease was made. "Abandonment is the relinquishment or surrender of rights of property by one person

to another; it includes both intention to abandon and the external act by which the intention is carried into effect:" 1 Am. & Eng. Ency. of Law (2d ed.), 1, and notes.

The position, that the plaintiff, when she caused the wells on this lease to be shut down and the tools safely locked up, intended to abandon her claim to the lease and her right to remove personal property of great value, is under the facts found clearly untenable. The letter of the attorneys in fact shows that no abandonment was intended, and the writer of the letter says in his testimony that none was intended, but that they expected to come back in the spring and clean out the wells. And we think it is clear, independent of his testimony as to their intention, that the plaintiff intended in the spring to come back and either clean out the wells or remove her personal property, the right to remove which was given by the lease. " Forfeiture means the loss of something as a penalty for doing or omitting to do a certain required act." In the lease, under which the plaintiff claims, we are unable to find any covenant expressed or implied that the plaintiff so far failed to perform that would forfeit to the defendant not only her right to take the oil and gas found in the land, but her right to remove " at any time any and all machinery, oil well supplies or appurtenances and property of any kind to her belonging." Forfeitures are not favorites of the law, and equity may relieve against them even where the act of the party out of which the forfeiture arises is unequivocal and undisputed. In the case at bar the only grounds upon which the defendant might claim that the plaintiff had forfeited all her rights under the lease is that she shut the wells down. But she was only bound under her implied covenant to operate them as long as oil and gas were found in paying quantities. If oil and gas were not being found in paying quantities she had the right to shut down the wells and take such time as the defendant would allow her, or as was reasonable, to remove her machinery. But suppose, for the sake of the argument, that there had been written in this contract of lease these words: " If oil is found in paying quantities, the lessee shall operate the producing wells continuously and with reasonable diligence, and if he fails to do so and thus deprives the lessor of his royalty, he shall forfeit to the lessor his rights to further operate, and the oil and gas remaining in the

leased premises shall revert to the lessor." Would such a clause of forfeiture be self-operating, and would it affect the right to remove the machinery? In our opinion it would not. It would be operative only from the time the lessor elected to enforce it. And the lessor could not by the same act terminate the lease and appropriate the personal property and fixtures of the lessee to his own use. A reasonable time should be given to remove these after the forfeiture was declared. Surely equity would not allow a forfeiture of the lease and what was demised and granted by it to the lessee to carry with it a forfeiture of the right reserved to the lessee to remove his machinery, etc., unless the forfeiture of the machinery was also expressly provided for. "Where a lease provided for forfeiture for nonpayment of royalty, and also that new buildings placed upon the land by the lessee might be reserved at the termination of the lease, unless all right thereto has been forfeited by a forfeiture of the lease, . . . . Held, that the right to remove buildings within a reasonable time was not lost by forfeiture for nonpayment of royalty. The forfeiture for nonpayment was a forfeiture of the lease only, and it should clearly appear that it also provided for the forfeiture of the buildings before it can be declared so:" Barringer & Adams, Mines & Mining, 151; Mickle v. Douglas, 75 Iowa, 78; 12 Am. & Eng. Ency. of Law, 758, note 7; Wick v. Bredin, 189 Pa. 83.

This brings us to the consideration of a question that, so far as we know, has not been before any of our courts, and that is, what is the true interpretation to be put upon the words "and as long thereafter as oil or gas is found in the land herein described in paying quantities," as found in this lease? The parties fixed the term of the lease at ten years, which expired on April 22, 1897, but they provided in case oil or gas was being profitably mined at the end of this term that it could be extended to another date to be fixed by the failure of the land leased to yield oil or gas in paying quantities. When this uncertain date was capable of being made certain, then the lease could be terminated, and after that date the lessee, if he did not surrender the premises, was a tenant at will, and the landlord could at any time enter and repossess himself of the premises demised, and after such entry the rights of the lessee to the oil and gas, even if it was afterwards discovered in paying quantities by the

landlord, would be terminated.   The true interpretation of the words " as long thereafter as oil or gas is found in the land in paying quantities " is not " as long thereafter as oil or gas can be found in the land in paying quantities by any one," so as to give the lessee a tenancy until all the oil and gas in the land shall be exhausted, but is this, " as long thereafter as oil or gas is actually being found in the land in paying quantities under such developments as the lessee has seen fit to make under her covenants in the lease."   Taking her manner of operating the lease, the ten-year term having expired, the moment she failed to produce oil in paying quantities, that moment the tenancy became a tenancy at will, which could be ended at any time by either the tenant or the landlord.   We cannot see how a lessee in an oil lease on a royalty, not an annual rental, holding over (after a definite term has expired) under the extension of the term for " as long thereafter as oil is found in paying quantities," can be a tenant from year to year, as suggested by the counsel for the plaintiff.   In a tenancy from year to year " the holding over implies a term of the same duration as the original term, and the payment of an annual rental."   The lease here definitely fixes the length of the extended term.   A failure at any time after April 22, 1897, to produce oil in paying quantities ends it, and a holding over after that contingency could not by implication be for the purpose of producing oil.   After the failure to produce oil in paying quantities the plaintiff's rights are limited (if the defendant elects to terminate the lease) to the removal of his machinery and to a possession for a reasonable length of time that this might be accomplished, if the property has not been taken but remains as the plaintiff left it when he stopped producing oil.   Where oil was no longer being produced in paying quantities the lease was liable to be terminated, and after that, in our opinion, it must be regarded as a tenancy at will, and not from year to year, or if not a tenancy at will, then a tenancy at suffrance.

In conclusion, then, our opinion, under the facts and the law as we have found them, is that when the wells were shut down in November, 1897, when they were not producing oil or gas in paying quantities, and when the plaintiff left the premises for the winter, the tenancy became a tenancy at will, and that the defendant then and afterward, so long as these conditions re-

mained, had the right to terminate the lease, and that his entry in April, 1898, to terminate it, if confined solely to that purpose, was not unlawful. But that he had no right, as part of the act terminating the lease, to take and appropriate the plaintiff's machinery, oil well supplies and other personal property. He could not lawfully enter to take the fixtures. It was his duty,—she not having elected to terminate the lease nor having consented to the entry of the defendant,—to give her a reasonable time and opportunity after notice to remove her property. " Where the tenancy is uncertain in duration, as when it depends upon a contingency or when the lessee is a tenant for life or at will, the law allows a reasonable time for the removal of fixtures : " 8 Am. & Eng. Ency. of Law (1st ed.), 62.

And this brings us to the question, what kind of a judgment should be entered in this case on our findings? We are asked to enter a judgment for the plaintiff, if not generally, at least for the possession of the land " for the purpose of removing the property placed thereon by the lessee and its assigns in the operation for oil and gas." It is true that ejectment is an equitable remedy, and conditional judgments are sometimes entered to force the defendant to do equity. But in this case the evidence shows that the plaintiff's property has been appropriated by the defendant, and much of it has been changed in character, and we do not see how, in an action of ejectment, we could mould a judgment that would give to both parties their rights. The most that we can do for the plaintiff is to mould the judgment so as to show that her right to the machinery, oil supplies, pipes, boilers, engines, tools, etc., on the land in dispute and taken by the defendant, as she claims unlawfully, is not adjudicated in this case, and her property is not, by reason of the judgment herein entered, to be considered as part of the land (the possession of which is found to rightfully be in the defendant), at the time he re-entered in April, 1898.

Plaintiff's points and the answers thereto were as follows :

1. The plaintiff, under the lease made by the defendant, was in possession of said land under a tenancy from year to year, and could not be dispossessed without due and legal notice to quit given by the defendant. *Answer :* Refused.

2. Under all the evidence in the case the plaintiff is entitled to the possession of the land in dispute for oil and gas purposes. *Answer :* Refused.

3. If the second point is refused, then, under all the evidence in this case, the plaintiff is entitled to the possession of the land for the purpose of removing the property placed thereon by the lessee and its assigns in its operations for oil and gas. *Answer:* Refused.

And now, February 2, 1899, it is ordered that this decision be filed in the prothonotary's office and that notice of said filing be given to the plaintiff and the defendant or their counsel, and if no exceptions be filed to said decision within thirty days, that judgment be entered in favor of the defendant for the land described in the plaintiff's præcipe for oil and gas purposes and for the oil and gas in said land, without prejudice to the plaintiff's right to maintain an action against the defendant for taking and appropriating any machinery, oil well supplies or property of any kind that belonged to her and which may have been upon said land when the defendant took possession of it for oil and gas purposes, and when he, without notice, terminated the plaintiff's lease ; the plaintiff's and defendant's rights as to said machinery, oil well supplies and property not having been adjudicated in this action.

On exception McILVAINE, P. J., filed the following opinion:

The exceptions taken by the plaintiff to the decision of the court in this case are to the conclusions of law and not to the findings of fact, and raise two questions which merit consideration : first, in April, 1898, when the defendant dispossessed the plaintiff, was she a tenant from year to year; and second, under the facts in this case, is ejectment the plaintiff's remedy to recover the "machinery, oil well supplies and other property" placed by her and her predecessors in title upon the leased premises, granting that her title to the leasehold estate was terminated by the entry of the defendant ;—in other words, should the plaintiff's third point have been affirmed and judgment entered in accordance therewith?

First question: The unique character of an "oil lease" makes it somewhat difficult to apply the well established rules that, under the common law, apply to the ordinary lease where the relation of landlord and tenant, pure and simple, is created. In an oil lease the "lessor" and the "lessee" sustain a dual relation to each other. In a sense they are landlord and tenant,

but they also sustain the relation of "grantor" and "grantee" of an interest in lands. The lessee is a tenant as to the surface of the land so far as it may be necessary to carry on his mining operations, but as to the oil in the land after it is discovered by the drill he is the "grantee,"—the owner in fee simple. The lessor for the occupancy of the surface of the land does not, as is usual with landlords, receive a rent,—a compensation payable periodically, nor does he receive part of the produce of the land leased,—he receives part of the land itself,—a royalty,—a part of the oil mined and oil in place is real estate. The tenancy of the plaintiff in this case, which alone related to the surface of the defendant's land after April 22, 1897, was not in consideration of the payment of a sum of money periodically made, but depended upon the continued production of oil in paying quantities : or, stated negatively, upon the exhaustion of the mineral that was being mined. The moment that oil was not being produced in paying quantities, and that fact was ascertained and declared, that moment the right to occupy the surface for oil and gas purposes ceased, regardless of the fact that the termination of the fixed term of the lease was on April 22, 1897. To say that the lease after April 22, 1897, was a lease from year to year, would be to change the contract of the parties from a lease to continue "so long thereafter as oil may be found in paying quantities" to a lease to continue "so long thereafter as oil may be found in paying quantities, provided the termination shall only occur on April 22, the end of a year counting from April 22, 1897, the end of the fixed term." That is to say, if the leased premises actually and beyond dispute produced some oil, but not in paying quantities, say on April 24, 1897, the lessee, for the gain of the lessor, would be bound to pump the wells at a loss until April 22, 1898, there being some to be pumped ; or if the oil was totally exhausted, the lessee could retain the surface of the land for one year lacking two days, without compensation to the lessor. Surely the parties did not intend this. Again, suppose that on November 14, 1897, the plaintiff, in place of shutting down, had, against the will of the defendant, removed all her machinery, oil well supplies and other property because the lease was not producing oil in paying quantities, could the defendant (admitting the fact that oil was not being produced in paying quantities)

maintain an action against the plaintiff for royalties for the year ending April 22, 1898, fixing the amount at the same as he received the year ending April 22, 1897? Certainly not. As we said in our attempt to vindicate our conclusions of law in the decision heretofore filed, we know of no case where the question here raised has been passed upon by any of our courts. Adopting a rule, then, that will do equity to both parties, we hold that in an oil lease for a fixed period and " as long thereafter as oil is found in paying quantities," where the lessor's compensation is one eighth of the oil produced, the tenancy as to the surface of the land, after the expiration of the fixed period; and after the fact that oil is not being found and produced in paying quantities becomes susceptible of proof, is a tenancy in the nature of a tenancy at will, and if not actually terminated by mutual consent, or continued by mutual consent in order that further exploration be made, may be terminated by either party.

Second question : Here we have another new question. At first our mind was inclined to yield to the argument of counsel for the plaintiff. But, on reflection, our best judgment is that the wrong the defendant did (if any) was not so much against the plaintiff's right of possession, her right to enter and remove her property, as it was against her title to the personal property in question—her right to the property itself. From the testimony in the case, and from what was said by the counsel of the defendant at the argument, and from the inferences that can be fairly and legally made from what was developed in this trial, the defendant, when he took possession of the plaintiff's property, not only intended to terminate the leasehold estate, but to actually appropriate and convert to his own use the property that, at least during the running of the lease, was the plaintiff's personal property. Suppose that on the very day that the defendant entered to terminate the leasehold estate he had moved the boilers, engines, loose tools and other personal property off the land and sold them, what would the plaintiff's remedy have been? Certainly we could not have entered judgment in this ejectment suit against him conditioned that it would be released and set aside upon his returning to the plaintiff the personal property or the money he received from its sale. The defendant did not sell the property, it is

true, but he took it and converted it to his own use, and to some extent has changed its character. And if it was personal property when the defendant appropriated it to his use (and not part of the real estate, as claimed by the defendant), then we take it the plaintiff's remedy against the defendant would be the same as against a stranger to the lease, or as it would have been against the defendant had he, during the ten-year term, taken and appropriated to his own use the personal property.

The controversy between the plaintiff and defendant (granting that the plaintiff is not entitled to the possession of the land in dispute for oil and gas purposes) turns upon the question whether the machinery, oil supplies and other property on the land when they were appropriated to his use by the defendant was personal property or part of the real estate; if the latter, then the plaintiff's third point could not be affirmed; if the former, then the defendant was guilty of trover and conversion, if the property, as we have found, was not abandoned nor forfeited, and the third point could not be affirmed.

And now, April 8, 1899, exceptions overruled, and it is ordered that judgment be entered in accordance with decree herein filed with decision on February 2, 1899.

*Error assigned* was the judgment of the court.

*H. M. Dougan,* with him *John W. & A. Donnan,* for appellant.—By the drilling of the wells provided for by the contract in the lease, and the finding of oil in paying quantities, the lessee and its assigns had a vested interest or estate in the lands leased "for the term of ten years and as long thereafter as oil or gas is found" thereon in paying quantities: Venture Oil Co. v. Fretts, 152 Pa. 460; Karns v. Tanner, 66 Pa. 297.

The lessee was given the right to enter upon the premises for the purpose of mining for oil; that this right could be enforced by an action of ejectment in Pennsylvania needs no citation of authorities. He was also given an exclusive right to lay pipe lines for water, gas, steam and oil over and across said premises; that this could also be enforced by an action of ejectment is shown in Railway Co. v. Peet, 152 Pa. 488.

That the ejectment lies, we think is supported by numerous

authorities: Hill v. Hill, 43 Pa. 521; Jackson v. Buel, 9 Johns. 298; Beatty v. Gregory, 17 Iowa, 109; Integral Quicksilver Mining Co. v. Altoona Mining Co., 75 Fed. Rep. 379; Coburn v. Ames, 52 Cal. 389; Clark v. Smith, 25 Pa. 140.

*T. F. Birch*, for appellee.

PER CURIAM, October 30, 1899:

All the material facts of this case are clearly presented in the findings and opinions of the court below, to whose decision the case was submitted by the parties.

Our consideration of the record has led us to the conclusion that there is no substantial error therein, and therefore neither of the specifications of error should be sustained.

The questions involved have been sufficiently noticed by the learned trial judge, and on his opinion the judgment is affirmed.