Note.—See under (1) 27 Cyc. pp. 1812, 1866; anno. 23 L. R. A. 127; 25 R. C. L. p. 1346. (2) 37 Cyc. p. 364; anno. 68 L. R. A. 523; 25 R. C. L. pp. 1313, 1314; 3 R. C. L. Supp. p. 1451; 5 R. C. L. Supp. p. 1371. (3) 37 Cyc. p. 371.

---

## PINE v. WEBSTER.

No. 16210—Opinion Filed April 6, 1926.

Rehearing Denied May 11, 1926.

1. Oil and Gas—Construction of Lease—"Found in Paying Quantities."

The phrase "paying quantities," as used in the extension provision of an oil and gas lease, when applied to production of oil, means such a quantity of oil as will pay a profit on the cost of operating the well; and the words "found in paying quantities," when applied to the production of oil, mean not only discovery, but taking it out of the ground in pursuance of other warranties and purposes of the contract.

2. Guardian and Ward—Acceptance of Payments by Guardian After Minor's Majority Not Binding.

Payments made to the guardian of a minor after majority, of which the minor, now of age, has no notice, is not binding upon him for any purpose.

3. Equity—Action by Lessee to Quiet His Title—Issues Determinable.

Where plaintiff claims possession of the premises and brings his action to protect the same by restraining the defendant from interfering with his property situated on said premises, and to cancel the claims of defendant adverse to his possession and rights, the action is one of equitable cognizance, and the court has jurisdiction to determine all the issues presented by the pleadings.

(Syllabus by Threadgill, C.)

Commissioners' Opinion, Division No. 2.

Error from District Court, Okfuskee County; John L. Norman, Judge.

Action by S. S. Webster against W. B. Pine. Judgment for plaintiff, and defendant appeals. Affirmed.

Hiatt & Hannigan and Patterson & Dooley, for plaintiff in error.

Poe & Lundy and R. E. Morgan, for defendant in error.

Opinion by THREADGILL, C. The question involved in this case is the validity of an oil and gas lease made with the guardian of a new-born Creek minor allottee to be in force during said minor's minority, upon certain conditions, and to continue in force after minority in case oil or gas was found in paying quantities during the minor's minority. W. B. Pine, plaintiff in error, was defendant in the trial court, and S. S. Webster, defendant in error, was plaintiff, and, for convenience, we will refer to them as they appeared in the trial court.

The material facts necessary for our consideration are substantially as follows: Laura M. Myers was a Creek minor allottee, and owned the land in controversy. She was born January 27, 1905, and her minority would expire on January 26, 1923. On August 19, 1913, the minor's guardian executed to defendant, W. B. Pine, an oil and gas lease on her allotment, being in section 3, T. 11 N., R. 11 E., in Okfuskee county, which was to be in force during her minority, upon condition of development and a royalty in-

terest or annual rental payments in lieu of development, and to continue in force after minority, if oil or gas was found in paying quantities during minority; the language of the lease contract in this particular being as follows:

"And by these presents does grant, demise, lease, and let unto the said second party, his heirs, successors, or assigns, for the sole and only purpose of mining and operating for oil and gas, and of laying pipe lines, and building tanks, power stations and structures thereon to produce and take care of said products, during the minority of said ward, and as much longer thereafter as oil or gas is found in paying quantities."

The defendant, W. B. Pine, paid the annual rentals provided for in the contract, but did not commence development by drilling his first test well for oil and gas until about December 23, 1922, in which he struck a showing of oil at a depth of about 2,477 feet on January 23, 1923, just three days before the allottee reached the date of her majority. As soon as a showing of oil appeared the work of drilling was stopped. Oil and water ran in the well to a distance of from 900 to 1,000 feet. This oil was estimated at about 1½ to two barrels per hour, and the water and oil caused the well to cave for a short distance, and the same was bailed and poured out down the hill as slush. Some of the witnesses testified that "it looked like a pretty good well at first." This bailing-out process was carried on until after January 27th, and none of the oil saved for any purpose. While this well was being drilled another, called well No. 2, was commenced on another part of the lease, and was brought in as a gas well about January 30, 1923. After the gas well came in they moved back to well No. 1 and drilled to a depth of about 2,885 feet, but found no oil beyond the depth of the first showing. They plugged the well back to the depth where the first oil was found, and about February 5, 1923, commenced pumping the oil and water from said depth, and for about 15 days ran the same into a tank. The amount of oil and water that was pumped into the tank is not definitely estimated. Defendant then plugged the well and abandoned it. The witnesses testified that they used some of the water out of the tank for further operations on the lease, but none of the oil was used for any purpose. The defendant did not make any division of the oil, they say was in the tank, with the owner of the lease, nor did he offer to pay anything for that part the owner was entitled to. Defendant paid to the guardian of the allottee the contract price on the gas well for one year, which was deposited in a bank by the guardian to

the credit of the allottee, and she checked on the account from time to time, but she testified that she did not know that any of the funds in the account came from such payment, and there is no proof that the guardian informed her of the payment, but rather to the contrary.

The record discloses that defendant made no efforts at future development on the leased premises until the spring of 1924. On March 14th, of that year, the said Laura M. Myers, who had by marriage become Hightower, joined by her husband, executed an oil and gas lease to the plaintiff, S. S. Webster, who commenced development, under the terms of his lease, and defendant interfered with plaintiff's operations and renewed his efforts to drill again on the lease, and this action was brought to enjoin defendant from interfering with plaintiff's rights, or setting up any claim against his rights in said land, and to cancel any claims of defendant against his title, and to quiet the title of his oil and gas lease contract. The issues joined on the question as to whether or not defendant found oil or gas, in paying quantities, under his lease with the guardian, prior to January 27, 1923, the date on which the allottee and owner of the land reached her majority. After hearing the evidence the court stated:

"Gentlemen, to my mind this case presents a most interesting phase from a legal standpoint, whereas on the question of fact it has been rather simple as I view it. I am satisfied from a review of the very exhaustive briefs submitted, and the authorities, that the plaintiff had the right to maintain this action, and that the plaintiff is entitled to prevail if one single question of fact is established; that during the primary term of the lease under which the defendant was operating the premises, oil and gas was not produced in paying quantities. Knowing the defendant, Mr. Pine, as I do, and having the very great regard for him from a personal standpoint and from a business standpoint, I have been extremely careful in this case, in an effort to see if the proof would in any wise justify a finding in his favor, that he had within the primary term of the lease produced oil or gas, or either of them, in paying quantities, on this lease, and I am forced to conclude, gentlemen, that he has not. With this finding and conclusion it strikes me that this case is automatically disposed of. Therefore, judgment will be rendered in favor of the plaintiff. Prepare your journal entry and have it O. K.'d by counsel."

The journal entry states:

"The court finds from the evidence introduced that neither oil or gas was found in paying quantities during the minority of

said ward, and further finds that said Laura M. Myers, now Hightower, reached her majority on January 27, 1923, and that because of the fact that no oil or gas was found in paying quantities prior to said time, the oil and gas lease of the defendant, W. B. Pine, expired on said date, which was the end of the minority of the said Laura M. Myers, now Hightower."

Judgment was rendered in favor of plaintiff, and defendant brings the case here for review.

1. Defendant contends that the findings of the court, that neither oil nor gas was found in paying quantities during the minority of the allottee, and judgment entered thereon, were erroneous. He says the evidence does not support this finding and judgment. It is contended that "found in paying quantities" means any quantity of oil that "pays a profit, although it may never repay the cost of the well, and the operation as a whole." To support this view, we are cited to Thornton's Law of Oil and Gas (4th Ed.) pages 416, 418, 419, 426, and 427. However, it is conceded that the said phrase has been construed by this court to mean reasonable profit upon the entire cost of the adventure, including the cost of drilling and equipping the well. Ardizonne v. Archer, 72 Okla. 70, 178 Pac. 263; Pelham Petroleum Co. v. North, 78 Okla. 39, 188 Pac. 1069; Keechi Oil & Gas Co. v. Smith, 81 Okla. 266, 198 Pac. 588. The last expression of this court, March 16, 1926, in the case of Gypsy Oil Co. v. Stanley Marsh, No. 15015 (petition for rehearing pending), holds that:

"If the well pays a profit, even small, over operating expenses, it produces in paying quantities, though it may never repay its cost, and the operation as a whole may prove unprofitable."

We do not think there is any material controversy as to the meaning of these words in this case, but the controversy arises here as to what is meant by finding such a quantity of oil. Defendant contends that if the oil is found or produced in the sense of discovering it, by drilling a hole in the earth and by measuring its flow in barrels per minute or hour, as the case may be, without any regard to saving it and turning it into profits for both parties, he has fulfilled the condition. In other words, defendant's argument is, that since he drilled the hole in the ground and found some oil, estimated at from 1½ to two barrels an hour, as they bailed it out, where the oil and water had risen in the well to a distance of 900 to 1,000 feet, he fulfilled the extension provision in the lease, although he saved none of the oil for the market but bailed it out and poured it all down the hill as slush, and

thereafter plugged and abandoned the well without making any profits out of it. We do not think this construction reasonable.

Plaintiff contends that the oil must be found in the sense not only of discovering it but in getting it out of the earth in pursuance of the covenants in the lease, such as building tanks, power stations and structures and pipe lines to produce and take care of the oil, and set apart to the lessor the royalty provided in the contract or pay cash for same. To support this contention we are cited to the case of Cassell v. Crothers, 193 Pa. 359, 44 Atl. 446, in which this language is used:

"This brings us to the consideration of a question that so far as we know has not been before any of our courts; and that is, what is the true interpretation to be put upon the words 'and as long thereafter as oil or gas is found in the land herein described in paying quantities,' as found in this lease? * * * The true interpretation of the words 'as long thereafter as oil or gas is found in the land in paying quantities' is not 'as long thereafter as oil or gas can be found in the land in paying quantities by any one,' so as to give the lessee a tenancy until all the oil and gas in the land shall be exhausted; but is this; 'As long thereafter as oil or gas is actually being found in the land in paying quantities under such developments as the lessee has seen fit to make under her covenants in the lease.' "

Also, in the case of Murdock-West Co. v. Logan (Ohio) 69 N. E. 984, the court said:

"In order to continue their lease beyond the stipulated time, it was necessary for the lessees to find oil in paying quantities. For this purpose it was not sufficient to complete a well having some indications of oil or a well which might be developed into a well producing oil in paying quantities, but the lessees must actually find oil in paying quantities, and this is the same as obtaining and producing it in paying quantities. Cassell v. Crothers, 193 Pa. 359, 365, 367, 369, 44 Atl. 446. This the defendant did not do before April 22, 1900, and the rights under the lease ended when they ceased to operate the well on April 12, 1900, and did not complete it to the point of producing oil in paying quantities within the term ending April 22, 1900. Detlor et al. v. Holland, 57 Ohio St. 492, 49 N. E. 690, 40 L. R. A. 266; Gas Co. v. Tiffin, 59 Ohio St. 420, 54 N. E. 77."

In the case of Prowant v. Sealey, 77 Okla. 244, 187 Pac. 235, this court said:

"If the lessee prospects for and finds oil or gas on the leased premises before the expiration of the three-year period, the lease is extended beyond that term as long as oil or gas is found therein, provided, of course,

that the oil or gas so found is run from the lease as contemplated by the parties."

See, also, Union Gas & Oil Co. v. Adkins, 278 Fed. 854; Enfield v. Woods (Ky.) 248 S. W. 842; Gypsy Oil Co. v. Ponder, 92 Okla. 181. 218 Pac. 663.

Applying this construction to the facts in the case at bar. we are forced to the conclusion that the defendant failed to find oil or gas in paying quantities on the leased premises before the owner of the land reached her majority. and the contract terminated with January 26, 1923, the last day of her minority.

2. Defendant further contends that while he was working on the oil well No. 1, the gas well No. 2 was brought in on January 30, 1923, with the capacity of 5,000,000 cubic feet, and he paid the gas rentals in the sum of $500 by checks during the year 1923, after the minor became of age, and the checks were deposited to the account of Laura M. Myers. the allottee, in the Citizens National Bank of Okmulgee, and she checked on the account, thus acquiescing in the payment and taking the benefits. and she is thereby estopped from contending that the term of the lease had expired. We cannot agree with this contention, for the reason that the evidence shows the checks were received by her father, who had been her guardian, and deposited by him to her account, which had been established prior to that time, and she had no notice of these payments or deposits, and under these conditions she could not be bound by the payments.

3. Defendant further contends that plaintiff was not entitled to maintain this action against him. This contention seems to be based upon his claim that his lease was still in force, that he was still in possession of the premises, and was using gas from the gas well, and plaintiff did not obtain his lease from the owner of the land until more than a year after she reached her majority, and defendant had no notice of any dissatisfaction on the part of the owner with his development of the lease. He cites the case of Kolachny v. Galbreath, 26 Okla. 772, 110 Pac. 902, and Thornton's Law of Oil & Gas (4th Ed.) sections 130 and 924.

We do not think there is any merit in this contention, nor do we think these authorities applicable to the facts in the case. The evidence shows that the land was uncultivated land; that defendant had done nothing in the way of development since he brought in the gas well about January 30, 1923. Plaintiff had moved certain machinery, equipment, and timbers on the premises, and was making preparations to develop, under his contract, and defendant interfered with his plans by moving the timbers away from where plaintiff had placed them, and thereupon this action was commenced.

We have already held that defendant's lease expired on January 26, 1923, for failure to find oil or gas in paying quantities, and this being the case, defendant had no rights under his lease, and the owner was free to lease the premises to plaintiff, and he had the right to ask the court to protect his possession and property under the lease, and quiet his title against the claims of defendant. In the case of Lancaster v. Kathleen Oil Co., 241 U. S. 551, 60 L. Ed. 1161, an Oklahoma case, Chief Justice White, speaking for the court, says:

"It is said, however, if the bill be thus construed, the suit is in substance one to quiet title. and under the well-settled rule, such a suit can be brought only by one in possession (citing cases). But this contention overlooks the reason upon which the rule is based. as pointed out in the cases relied upon. which is. that one out of possession has an adequate remedy at law by a suit in ejectment. As it is conceded that the legal remedy was not here available, and that there was, hence, jurisdiction in a court of equity to determine the right of possession, it is clear that the rule has no application, and that the court had equitable jurisdiction to determine all the issues presented by the bill."

Finding no error in the record, the judgment of the trial court is hereby affirmed.

By the Court: It is so ordered.

Note.—See under (1) 27 Cyc. p. 722; 12 R. C. L. p. 870. (2) 28 C. J. p. 1161 § 277 (Anno). (3) 27 Cyc. p. 733 (Anno); 32 Cyc. p. 1305.