J-A11006-23

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| DOUGLAS EQUIPTMENT, INC.; DOUGLAS ENERGY, LLP; FIRST BAPTIST CHURCH OF WAYNESBURG; D & W RESOURCES, LP; AMY LYNNE MENDICINO AND MARK MENDICINO | : : : : : : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| Appellants | : : | |
| v. | : : | No. 674 WDA 2022 |
| EQT PRODUCTION COMPANY; GARY N. LEE; DEBORAH H. CAMPBELL AND MARY H. ULAM, ADMINISTRATRICES, D.B.N.C.T.A OF THE ESTATE OF WILLIAM E. HOLT, DECEASED; DEBORAH H. CAMPBELL AND MARY H. ULAM, EXECUTRICES OF THE ESTATE OF NIRA W. HOLT, DECEASED; ROBERT E. LEE AND MICHELLE LEE, HUSBAND AND WIFE, ROBERT LEE 2015 IRREVOCABLE TRUST; AND RICE DRILLING B LLC | : : : : : : : : : : : : : : : | |
| Appellees | : | |

Appeal from the Order Entered May 10, 2022
In the Court of Common Pleas of Greene County
Civil Division at No: AD No: 77-2017

BEFORE: BENDER, P.J.E., STABILE, J., and PELLEGRINI, J.[*]

MEMORANDUM BY STABILE, J.: **FILED: AUGUST 15, 2023**

Appellants (collectively "Douglas Appellants") appeal from the May 10, 2022 order entered in the Court of Common Pleas of Greene County granting summary judgment in favor of Appellees (collectively "EQT Appellees") and

_____

[*] Retired Senior Judge assigned to the Superior Court.

denying the Douglas Appellants' motion seeking summary judgment against the EQT Appellees.[1]  The Douglas Appellants contend that the trial court erred in finding their oil and gas lease invalid and in finding the EQT Appellees' oil and gas lease valid.  After careful review, we affirm.

In many oil and gas lease cases, the factual history is lengthy and rather convoluted.  This case is no exception.  However, the parties do not suggest that any genuine issues of material fact are at issue here.  We offer the following abridged version of facts pertinent to our review of the legal issues before us.

By deed dated August 31, 1972, the property in question (approximately 321 acres, referred to herein as "the Subject Land") located in Gilmore Township, Greene County, was conveyed to J.K. Willison and his wife, Wynona, and to J. Kenneth Willison, Jr., and his wife, Sherry.  The conveyance included all oil and gas rights for the property.  On August 12, 1987, J.K. and Wynona Willison conveyed their undivided one-half interest in the property to

_____

[1] The Douglas Appellants include Douglas Equipment, Inc.; Douglas Energy, LLP; First Baptist Church of Waynesburg; D&W Resources, LP; Amy Lynne Mendicino; and Mark Mendicino.  The EQT Appellees include EQT Production Company; Gary N. Lee; Deborah H. Campbell and Mary H. Ulam, as Administratrices, D.B.N.C.T.A., of the Estate of William E. Holt, Deceased, and as Executrices of the Estate of Nira W. Holt; Robert E. Lee and Michelle Lee, husband and wife; Robert Lee 2015 Irrevocable Trust' and Rice Drilling B LLC. The roles of the parties will be discussed as pertinent to the matters raised in this appeal.  We note that Rice Drilling was dismissed from the action by agreement of the parties, *see* Trial Court Order, 5/10/22, at ¶1, and is not a party to this appeal, despite its name appearing in the caption.

J.K., Jr., and Sherry Willison (hereinafter "the Willisons"). Again, the conveyance included oil and gas rights.

On October 3, 1994, the Willisons entered into a lease with Douglas Equipment covering the property ("the Douglas Lease"). At that time, one vertical well was located on the property. Its operator transferred the well to Douglas Equipment in May 1995. *See* Deposition of Douglas Galbraith, 12/17/20, at 51; Reproduced Record ("R.R.") 611a. As will be discussed herein, the last production from the well occurred in October 2008. *Id.* at 54; R.R. 612a.

The Douglas Lease, which was not recorded initially,[2] leased the land to Douglas Equipment "for the purpose of exploring and operating for and producing and saving oil and gas." Douglas Lease, 10/3/94, at ¶ 1; R.R. 97a. A provision set forth the duration of the lease as follows:

> 3. **DURATION OF LEASE** – **To have and to hold the said land and privileges for the said purposes for** and during a period of 1 (one) year from date of signing and **as long after commencement of operations** on said land, or any portion thereof[,] . . . is operated for the exploration or production of gas or oil, or **as gas or oil is found in paying quantities thereon**[.] The Lessee shall have the right to shut-in any and all wells on said land on payment of a shut-in royalty as hereinafter set forth for a period up to three (3) years. Lessee has the further right to re-enter the lease following termination of the lease in order to plug any and all wells, reclaim the surface and comply with all applicable laws.

---

[2] The lease was eventually recorded in 2009, as an exhibit to a document that purported to ratify the Douglas Lease.

Douglas Lease, 10/3/94 at ¶ 3; R.R. 98 (emphasis added).[3]  The lease also included terms for production royalties to be paid to the Willisons for petroleum oil found and saved, and for each well that produced gas marketed by Douglas.  *Id.* at ¶ 5; R.R. 99-100.  Further, the lease provided for annual payments of $250 for up to three years as the shut-in royalty for wells no longer profitable to operate.  *Id.* at ¶ 7; R.R. 100-01.

On July 26, 1999, while the Douglas Lease was in full force and effect, the Willisons conveyed the Subject Land by general warranty deed ("1999 Deed") to William E. and Nira W. Holt (undivided one-half interest) and Robert Lee (undivided one-half interest) (together "Holts/Lee" or "the Holts and Lee").  The 1999 Deed included five exceptions, two of which related to veins of coal "within and underlying" the land, and two of which related to smaller tracts of land previously conveyed by the Willisons.  The final exception was not for coal or other mineral rights or for tracts of land but rather was for "all rights, title, and interest" in the Douglas Lease, except for the lease's free gas privilege for the personal use of the Holts/Lee purchasers.  Deed, 7/26/99, at 2; R.R. 52a. ("Douglas Lease Exception").  Importantly, the 1999 Deed conveyed the Subject Lands to the Holts and Lee,

> TOGETHER with all and singular the rights, liberties, privileges, hereditaments, and appurtenances, whatsoever thereunto belonging, or in any wise appertaining, and **the reversions** and remainders, rents, issues, and profits thereof, and also, all the

---

[3] Because this case does not involve any claims relating to storage of gas, we have redacted the lease provisions addressing storage on the land.

> estate, right, title, interest, property, claim, and demand whatsoever, of them, the said Grantors in law, or equity, or otherwise howsoever, of, in, to, or out of the same.
>
> TO HAVE AND TO HOLD the premises hereby granted, or mentioned, or intended to be, with the appurtenances, unto the said Grantees, their heirs and assigns[.]

*Id.* at 3; R.R. 53a (emphasis added).

As the trial court recounted, the Willisons and Douglas Equipment entered into a "farmout agreement" in 2006 and as well as an exploration agreement in 2009 with other entities. Both agreements included expiration provisions that would kick in if no drilling took place within specified periods of time. Both of those agreements terminated under those terms without any drilling having occurred. Trial Court Opinion, 5/10/22, at 6-7.

Production from the well subject to the Douglas Lease stopped in October of 2008. Douglas Equipment made shut-in royalty payments to the Willisons for the three subsequent years and beyond.

On February 19, 2016, the Holts and Lee, along with a related trust, entered into a lease with EQT ("EQT Lease") for oil and gas underlying the Subject Land. *Id.* at 7. On July 4, 2016, Douglas Equipment entered into a term assignment of oil and gas lease with LOLA Drilling I LLC, which is not a party to this litigation, and a ratification and cross-conveyance of oil and gas estate ownership with several of the Douglas Appellants identified in n. 1, *supra*.

- 5 -

On January 29, 2017, the Douglas Appellants filed a complaint contending, *inter alia*, that the Douglas Lease remained in full force and effect; that the Douglas Lease did not terminate when production stopped in 2008; that the lease became an at-will lease subject to continuation by mutual consent; and that the EQT lease would go into effect only upon expiration of the Douglas Lease. In response, the EQT Appellees asserted that the Douglas Lease expired once production ceased in October 2008 and shut-in royalties were paid for the subsequent three years. Because the Douglas Lease had expired, the ownership of the oil and gas rights reverted in accordance with the 1999 Deed to the Holts and Lee, who then had the power to enter into the lease with EQT. *Id.* at 7-8.

After the pleadings were closed, the parties filed motions for summary judgment, each contending that there were no genuine issues of material fact and that each was entitled to summary judgment confirming their oil and gas rights on the Subject Land. Argument was held on February 15, 2022.

By order entered May 10, 2022, the trial court denied the Douglas Appellants' motion for summary judgment and dismissed their complaint with prejudice. Order, 5/10/22, at ¶ 2. The court declared the Douglas Lease invalid. *Id.* at ¶ 3. The court granted the EQT Appellees' motion for summary judgment and declared the EQT lease valid. *Id.* at ¶¶ 4, 5. This timely appeal followed. The Douglas Appellants complied with the order to file a Rule 1925(b) statement. In response, the trial court issued a Statement pursuant

to Rule 1925, indicating that it was relying on its order and opinion filed on May 10, 2022.

The Douglas Appellants present one issue for our review that includes two sub-parts as follows:

1. Whether the trial court erred in granting summary judgment in favor of EQT and the Holts/Lees and in denying summary judgment to the Douglas Lease Parties, thereby declaring the EQT Leases valid and declaring the Douglas Lease invalid.

   A. Whether the trial court erred in failing to consider the all-encompassing language of "all right, title and interest" of the Douglas Lease Exception in determining the parties' motions for summary judgment.

   B. Whether the Willison Heirs and the Willison Heirs and Assigns, as lessor, and Douglas Equipment, as lessee, have continued the at-will Douglas Lease in effect by mutual consent.

Appellants' Brief at 2-3.

Our standard of review of an order granting summary judgment

requires us to determine whether the trial court abused its discretion or committed an error of law. Our scope of review is plenary. In reviewing a trial court's grant of summary judgment, we apply the same standard as the trial court, reviewing all the evidence of record to determine whether there exists a genuine issue of material fact. We view the record in the light most favorable to the non-moving party, and all doubts as to the existence of a genuine issue of material fact must be resolved against the moving party. . . . Upon appellate review, we are not bound by the trial court's conclusions of law, but may reach our own conclusions.

***Hunnell as Trustee of Hunnell Family Revocable Living Trust v. Krawczewicz***, 284 A.3d 1192, 1197 (Pa. Super. 2022) (quoting ***Wright v.***

*Misty Mt. Farm, LLC*, 125 A.3d 814, 818 (Pa. Super. 2015) (citation omitted)).

The parties do not take issue with the trial court's conclusion that there are no genuine issues of material fact. Our review of the record confirms that determination. Therefore, we shall review the legal analysis that led the trial court to conclude that the Douglas Lease is invalid and the EQT Lease is valid.

The trial court appropriately recognized that a careful review of both the 1994 Douglas Lease and the 1999 Deed from the Willisons to the Holts and Lee is essential to resolving the issues presented in this case. Trial Court Opinion, 5/10/22, at 8.

When analyzing a lease, the court must construe the terms of the lease agreement "as manifestly expressed," and "[t]he accepted and plain meaning of the language used, rather than the silent intentions of the contracting parties, determines the construction to be given to the agreement." *Willison v. Consolidation Coal Co.*, 637 A.2d 979, 982 (Pa. 1994).

In *T.W. Phillips Gas & Oil Co. v. Jedlicka*, 42 A.3d 261 (Pa. 2012), our Supreme Court explained that under an oil and gas lease, if oil or gas is produced, a fee simple determinable is created in the lessee, and the lessee's right to extract the oil or gas becomes vested. *Id.* at 267. A fee simple determinable is an interest in land that will automatically end if a certain specified event occurs. *Id.* (citing *Brown v. Haight*, 255 A.2d 508, 511 (Pa. 1969)). "The interest held by the grantor after such a conveyance is termed

'a possibility of reverter.'" *Id.* (quoting *Higbee Corp. v. Kennedy*, 428 A.2d 592, 595 (Pa. Super. 1981)).

As noted above, the Douglas Lease included a "Duration" provision that provided for an initial term of one year. As the trial court explained, the lease would continue

> if: 1) pooled or unitized with any other land for the production of gas or oil, 2) or gas or oil is found in paying quantities or stored thereunder, 3) or is used for storage of gas or the production, monitoring or observation of gas storage on lands in the general vicinity. Further, the lessee had the right of paying shut in royalties for three years. Production ceased on the Douglas Lease wells in October, 2008, and shut in payments were made and accepted by the Willisons [for a period of time] well in excess of the three years and in fact continued to 2018.
>
> The Douglas lessees pursuant to paragraph two of the lease: "(a) could conduct surveys; (b) drill wells, produce, save, process, and sell and transport oil and gas, including the right to deepen, rework, or plug back in an existing well or other hole." Further the Lessees, "have ingress and egress over, under, through, upon, and across the land for any of the Lessee's operations hereunder."

Trial Court Opinion, 5/10/22, at 8-9 (with minor edits).

The trial court recognized that "[o]il and gas leases are not controlled by normal landlord tenant law. The law has developed to provide that an oil and gas lease despite the use of the term, 'lease' actually involves the conveyance of property rights." *Id.* at 9 (citing, *inter alia*, *Nolt v. TS Calkins & Associates, L.P.*, 96 A.3d 1042 (Pa. Super. 2014)). Further:

> The title conveyed in an oil and gas lease is inchoate, and is initially for the purpose of exploration and development. . . . If development during the agreed upon primary term is unsuccessful, no estate vests in the lessee. If, however, oil or gas is produced, a fee simple determinable is created in the lessee,

and the lessee's right to extract the oil or gas [becomes vested]. A fee simple determinable is an estate in fee that automatically reverts to the grantor upon the occurrence of a specific event. The interest held by the grantor after such a conveyance is termed a possibility of reverter. Such a fee is a fee simple, because it may last forever in the grantee and his heirs and assigns[, t]he duration depending upon the concurrence of collateral circumstances which qualify and debase the purity of the grant.

*Id.* at 9-10 (quoting *Nolt*, 96 A.3d at 1046-47, in turn quoting *Jedlicka*, 42 A.3d at 267) (internal quotations and citations omitted).

The trial court noted that a producing well was already in place at the time the Douglas Lease was signed and that Columbia Gas conveyed the rights to that well to Douglas in May of 1995. "Therefore, since a producing well was in place, the Willisons' interest under Pennsylvania law was a possibility of reverter." *Id.* at 10. "The plain language of the contract gave the Willisons the right to royalties, the right to use gas for one household, and of course the lessee retained full possession of said land for all purposes and uses not inconsistent or interfering with the aforesaid purposes and rights of the lessee." *Id.* (citing Douglas Lease at ¶ 8). Moreover, the lease contained a habendum clause, indicating that the duration of the lease was for "as long as . . . gas or oil is found in paying quantities thereon." *Id.* at 11 (quoting Douglas Lease at ¶ 3).

The court analyzed the language of the lease in relation to rulings from our Supreme Court and this Court, and recognized that:

The Supreme Court has ruled that "where a lessor's compensation is subject to a volume of production, the period of active

- 10 -

production of oil and gas is the measure of the duration of the lease." ***Clark v. Wright***, 166 A. 775, 776 (Pa. 1933). Pennsylvania has also held that in an oil and gas lease for a fixed period and "as long thereafter as oil is found in paying quantities" where the lessor's compensation is a percentage of the oil produced, the tenancy as to the surface of the land after expiration of the fixed period, and after the fact that oil is not found and produced in paying quantities becomes susceptible of proof, is a tenancy at will, and if not actually terminated by mutual consent, or continued by mutual consent in order that further exploration be made, may be terminated by either party. ***Cassell v. Crothers***, 44 A. 446 (Pa. 1899). Similarly, in ***Heasley v. KSM Energy, Inc.***, 52 A.3d 341 (Pa. Super. 2012), the Court found the lease to be restricted in duration based upon production. The Superior Court in ***Heasley*** supported the finding of the trial court that the leaseholds became tenancies in the nature of a tenancy at will at the time production ceased. They thus became subject to termination by either party. ***Heasley***, 52 A.3d at 347.

***Id.*** (with minor edits).

As the EQT Appellees recognize, an oil and gas lease "is in the nature of a contract and is controlled by principles of contract law." EQT Appellees' Brief at 29 (quoting ***Jedlicka, supra***, 42 A.3d at 267). "An oil and gas lease 'will not be construed to create a perpetual term unless the intention is expressed in clear and unequivocal terms.'" ***Id.*** (quoting ***Hite v. Falcon Partners***, 13 A.3d 942, 947-48 (Pa. Super. 2011) (quoting trial court with approval and citing ***Sterle v. Galiardi Coal & Coke Co.***, 77 A.2d 669, 672 (Pa. Super. 1951)). Because the Douglas Lease terminated in 2011 in accordance with its own terms, there was no basis upon which an extension could be authorized. "[G]ratuitous shut-in payments beyond the three-year period and payments made to [the Douglas Appellants] pursuant to agreements like the [2016] Exploration Agreement, the LOLA Assignment, or any other agreement could

- 11 -

not operate to extend the lease." ***Id.*** at 30 (citing several excerpts from the Reproduced Record).

Importantly, the Douglas Lease did not include language authorizing the parties to modify, amend, ratify, continue, or terminate the lease. Rather, it simply provided that the lease would terminate if oil and gas were not produced in paying quantities, and preserved to the Willisons only the right to royalties, the right to use gas for their household, and the possibility of reverter.[4]

The trial court next considered the effect, if any, that the 1999 Deed had on the Douglas Appellants' assertion that an at-will tenancy extended their rights and ability to enter into agreements after production stopped in 2008 and the shut in royalties were paid for three years. As reflected in the excerpt from the 1999 Deed quoted above, the deed included an exception for the Douglas Lease but then expressly conveyed all rights as well as "reversions" and remainders to the Holts/Lee purchasers. Deed, 7/26/99, at 2-3.

In analyzing the 1999 Deed, the trial court recognized that "[e]ffect must be given to all language of the instrument, and no part shall be rejected if it can be given a meaning." Trial Court Opinion, 5/10/22, at 13. The court

_____

[4] We note that the Holts/Lee purchasers did not sign any ratification or assignments documents.

- 12 -

found that the language in the Deed that included reversions was consistent

with 21 P.S. § 3 (Grantor's entire estate and rights conveyed), which provides:

> All deeds or instruments in writing for conveying or releasing land hereafter executed,[5] granting or conveying lands, unless an exception or reservation be made therein, shall be construed to include all the estate, right, title, interest, property, claim, and demand whatsoever, of the grantor or grantors, in law, equity, or otherwise howsoever, of, in, and to the same, and every part thereof, together with all and singular the improvements, ways, waters, watercourses, rights, liberties, privileges, hereditaments, and appurtenances whatsoever thereto belonging, or in anywise appertaining, and the reversions and remainders, rents, issues, and profits thereof.

21 P.S. § 3. "What this means is that there is a statutory presumption that

all of the grantor's rights are conveyed. Of course, if there are rights reserved

to the grantor in the deed, they will not pass to the grantee." Trial Court

Opinion, 5/10/22, at 14 (citing *Ladner Pennsylvania Real Estate Law*, Fifth

Edition 16.05(J)). "[T]he court concludes the Willisons conveyed all their

interests in the property to [the Holts and Lee], except for the exception and

reservations contained in the 1999 conveyance." *Id.* at 15. However, that

Deed did not except any possibility of reverter. In fact, it specifically conveyed

to the Holts and Lee the right of reverter. "If the Willisons had wished to

except the possibility of reverter they would have simply said so." *Id.* at 16.

"Pennsylvania has long recognized that the power to alienate a possibility of

reverter is in accordance with public policy favoring the alienability of land,

___

[5] The provisions of Section 3 were effective on April 30, 1925 and have not been amended since.

and thus permits the disposition of all reversionary interests, including the possibility of reverter, by devise, grant, assignment or release." *Id.* (quoting *Higbee Corp. v. Kennedy*, 428 A.2d 592, 595 n. 5 (Pa. Super. 1981)).

The court stated:

The plain language of [the reservation included in the 1999 Deed from the Willisons to Holts/Lee] neither retained the surface estate or the possibility of reverter, however, the exception would have preserved important rights to the Willisons including the right to all royalties including the three years [of] shut-in royalties. Had the well on the property produced gas in marketable quantities for a hundred years, the Willisons, their heirs and assigns would have had the legal right to royalties. However, in 2008, the well stopped production and after the three years of shut-in payments the oil and gas lease expired by its own terms in approximately 2011.

The 1999 conveyance to the Holts/Lees, their heirs and assigns would have, by its terms and by Pennsylvania law, conveyed the surface estate and the possibility of reverter of the oil and gas rights as they were not excepted or reserved. With the expiration of the lease in approximately 2011, the oil and gas rights reverted to the Holts/Lees. A tenancy at will would have been created pursuant to Pennsylvania case law between Douglas and the Holts/Lees, their heirs and assigns.

. . .

In our case, the Holts/Lees and their heirs and assigns, in signing oil and gas leases with EQT [and] then appearing in court to defend their clauses against Douglas would meet the requirements of the case law that any tenancy-at-will was terminated by the [Holts/Lees and their heirs and assigns].

Trial Court Opinion, 5/10/22, at 16-17.[6]

_____

[6] Although the EQT Appellees contend that no at-will tenancy was created, they do not take issue with the trial court's ultimate conclusion that any such
*(Footnote Continued Next Page)*

- 14 -

Again, the trial court concluded that the Douglas Lease terminated in 2011 under its own terms. At that point, in light of the right of reversion specifically granted to the Holts and Lee in the 1999 Deed, the oil and gas estate reverted to the Holts and Lee. The EQT Appellees aptly summarize the sequence of events and their legal ramifications as follows:

> As a result of the Douglas Lease, (1) Douglas Equipment held (a) a contractual right in the lease (which contained an express termination provision) and (b) a fee simple determinable in the oil and gas estate (which would terminate at the expiration of the lease); and (2) the Willisons held (a) a contractual right to royalties and (b) a future interest in the oil and gas estate (the possibility of reverter at the expiration of the lease).
>
> As a result of the 1999 Deed conveying the [Subject Land] from the Willisons to the Holts and Lee, (1) the Holts and Lee owned the possibility of reverter of the oil and gas estate (together with the surface and support estate); and (2) the Willisons held only a contractual right to royalties.
>
> When the Douglas Lease expired based on its express terms in 2011, (1) Douglas Equipment's fee simple determinable terminated as a matter of law and its contract rights terminated; (2) the oil and gas estate reverted to the Holts and Lee pursuant to the possibility of reverter they acquired in 1999; and (3) the Willisons' only interest in the Property—a contractual right to royalties—terminated.

EQT Appellees' Brief at 32 (with minor edits).

_____

tenancy would have been between Douglas Equipment and the Holts and Lee— rather than between Douglas Equipment and the Willisons—and that any such tenancy would have terminated at the time the Holts and Lee entered into the EQT Lease and defended against the Douglas Appellants' claim in court. **See** EQT Appellees' Brief at 34 n. 8 (citing Trial Court Opinion, 5/10/22, at 17).

The Douglas Appellants have filed a Reply Brief with this Court, complaining that neither the trial court nor the EQT Appellees appreciated the significance of the phrase, "all right, title, and interest," which appears in the Douglas Lease Exception. Again, that exception specifically related to the Douglas Lease—not to the oil and gas itself. By contrast, two of the remaining four exceptions related to the actual coal veins beneath the Subject Land, while the other two related to smaller tracts previously conveyed by the Willisons. As explained above, the Douglas Lease expired by its own terms after production ceased in 2008 and shut-in payments were made. At most, an at-will tenancy survived beyond 2011, but was terminated when the Holts and Lee entered into the EQT Lease and defended against the Douglas Appellants' claims in court. In either event, the Willisons could not have excepted any "right, title or interest" in the lease greater than the rights included in a lease itself. By virtue of the language of the lease, which expired under its own terms, coupled with the language of the 1999 Deed, which conveyed the right of reversion to the Holts and Lee, the Willisons did not retain any "right, title or interest" in the Douglas Lease beyond the royalties. The Douglas Appellants' argument lacks merit.

Based on the foregoing, we conclude that the trial court did not err in granting summary judgment in favor of the EQT Appellees or in denying summary judgment in favor of the Douglas Appellants. The court properly considered and correctly analyzed the language of the Douglas Lease and the

language of the 1999 Deed and concluded that the Willisons conveyed their right of reversion while retaining only the rights to royalties following the sale of the Subject Land. Consequently, even if an at-will tenancy survived the termination of the Douglas Lease in 2011, that tenancy expired when the Holts and Lee entered into the EQT lease and defended against the Douglas Appellants' claims in court. Therefore, we shall affirm the trial court's May 10, 2022 order granting summary judgment to the EQT Appellees and declaring the EQT Lease valid and further affirm the court's order denying summary judgment in favor of the Douglas Appellants and declaring the Douglas Lease invalid.

Order affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 8/15/2023