**JATH OIL CO., Plaintiff in Error,**

v.

**DURBIN BRANCH et al., Defendants
in Error.**

**No. 42887.**

Supreme Court of Oklahoma.

Oct. 12, 1971.

Rehearing Denied Nov. 23, 1971.

Cund, Garvin & Bonney, Duncan, for plaintiff in error.

DeBois & Peck by O. L. Peck, Jr., Duncan, for defendants in error.

McINERNEY, Justice:

This action to quiet title was commenced by Jath Oil Co., as the owner of "all the oil, gas and other minerals and mineral rights" on, in and under 30 acres of land in Stephens County, Oklahoma. The alleged cloud upon Plaintiff's title is an oil and gas lease covering the 30 acres, herein called the Wilson lease, executed April 11, 1914 by Lille Wilson as lessor, to W. G. Skelley as lessee "for the term of ten years from the date of the approval hereof by the Secretary of the Interior, and as much longer thereafter as oil or gas is found in paying quantities." The lease constitutes a cloud, in Plaintiff's view, because as Plaintiff alleges in its petition the Wilson lease expired by its own terms for failure to produce oil or gas from the leased premises in paying quantities.

The ownership of the leasehold interest has passed by mesne assignments to the several defendants, some of whose leasehold interests extend only to a depth of 1,000 feet; the leasehold interests of others extend only below a depth of 1,000 feet. Upon demand, each of the several defendants has refused to execute a release of the lease. Oil production in paying quantities was commenced by the lessee under the lease, from a depth less than 1,000 feet, during its primary term and has continued until February 1964 by the lessee or by one or more of his assigns. No production has occurred from any depth more than 1,000 feet. Thereafter for a period in excess of two years there was a cessation of production from the Wilson lease.

Accordingly under adequate pleadings the trial court was presented with the issue of whether the cessation of production was only temporary or if permanent was Plaintiff barred by estoppel and laches from claiming that the Wilson lease had terminated perforce a permanent cessation of production. After a full hearing the trial court found the issues in favor of Defendants and decreed that Defendants' title in and to the Wilson lease and leasehold be confirmed and adjudged to be valid and subsisting and in full force and effect.

The parties occupy the same positions on appeal as in the trial court and will be referred to by their trial court designations or by name. The survival of the defendants whose leasehold interests are below 1,000 feet depends obviously upon the producing operations of the defendants whose leasehold interests lie above 1,000 feet.

In May 1962, Defendant Oil Capitol Corporation acquired a ¾ interest to a depth of 1,000 feet in the 30 acre Wilson lease and the adjacent 30 acre Emerson lease for the purpose of secondary recovery by water flooding. Defendant Durbin Branch and J. N. King owned respectively a ⁹⁄₁₆ and a ¹⁄₁₆ interest in both leases to the same depth. These parties entered into an operating agreement May 1, 1962 making Oil Capitol the operator of the Wilson and Emerson leases, binding each party to the agreement to pay his proportionate share of the operating expenses and granting Oil Capitol a lien to satisfy unpaid operating expenses. Upon Oil Capitol's application, The Corporation Commission entered an order on January 11, 1963 authorizing a water flood operation on the Emerson and Wilson leases. These leases were acquired at the same time to be operated as a water flood. The Emerson lease has continued to produce in paying quantities. Accordingly there is no question concerning its continuing validity.

Jath Oil Company contends that the Wilson lease terminated because there was no production in paying quantities by Oil Capitol from the Wilson lease for the period February 1964 to October 1964 and no production at all from the Wilson lease for the period October 1964 to July 1966. As

later quotations from the record reveal, there is no dispute in the record as to this non-production history. Jath Oil Company did not become aware of this lapse in production or that water flood operations were attempted until May 1966. On this basis, Jath urges (1) the Wilson lease terminated for failure to produce after the primary term "except where production may be lessened by reason of a bona fide attempt to increase same in existing wells;" (2) "the period of cessation of production from the Wilson lease, viewed in the light of all the circumstances, was for an unreasonable period of time;" (3) "Estoppel and laches do not constitute a defense."

In support of Jath's position that the cessation of production was for an unreasonable period of time it appears that Branch's default occurred in December 1962. Oil Capitol made no complaint to Branch regarding his default until November 1963, a period of eleven months after default. Oil Capitol did not institute suit against Branch to foreclose its lien until July 1964, a period of eighteen months after default. Mr. March, President of Oil Capitol, testified on direct examination concerning the Wilson lease:

> "Well, actually, we suspended operations, frankly, until we knew the outcome of this law suit. We were unwilling to spend any more money to bring this water flood on either the Wilson or the Emerson up to what we thought it was capable of. Our attitude being that until we knew how that came out, we were going to produce the well with the water flood that we then had in rather than add new and expensive additional equipment."

Mr. Taylor, Production Superintendent of Oil Capitol, testified on cross examination:

> "Q Why did you cease operations because of this problem that you had with Mr. Branch?
>
> A Well, to my knowledge, we were just unable to collect the money.

> Q Is this the reason you ceased operations?
>
> A Yes.
>
> Q In other words, you could not operate unless you had this money from Mr. Branch?
>
> A We did not feel that we wanted to spend any more money and not have him pay his share because we, at that time, felt that we were paying his way and was not being repaid for it."

On cross examination Mr. March testified:

> "Q Let's look at it this way. From February of '64 until the end of '64, you had no direct expenditures on the Wilson lease, is that true?
>
> A If you will go along with me on what we've called unallocated as not being direct.
>
> Q Right. Now, the same is true for the year 1965?
>
> A That's correct.
>
> Q The same is true from January, 1966, up until about the first of May, 1966, at which time you drilled this well?
>
> A Approximately. About the first of May, it could have been April."

On direct examination Mr. Taylor testified:

> "Q So then your item of expenses shows no expense directly on the Wilson lease from about January of 1964—oh, with the exception of a little expense in December of '64—down until April or May of '66, is that correct?
>
> A That's correct.
>
> Q Now, basically, tell the Court why there was no expense directly on the Wilson lease during that period of time?
>
> A Well, the reason was that we were unable to collect from the partner, the Durbin Branch interest, and we felt that until we did that, we

shouldn't go any further, or get a new partner; we wanted to keep the flood going and we kept injecting water and it took a long time. We had to sue and this took time and then it was necessary to get the monies."

Default judgment was entered against Branch in Oil Capitol's lien foreclosure suit on January 8, 1965. Branch's interest in the Wilson lease was sold to Oil Capitol at sheriff's sale April 27, 1965. A deficiency judgment was entered on June 21, 1965.

On the other hand, Oil Capitol and other defendants contend (1) "The cessation of production on the Wilson lease * * * was not for an unreasonable period of time when viewed in light of all the circumstances;" (2) "The silence and acquiescence of the plaintiff during the * * * cessation period and during the installation of the Wilson-Emerson water flood constitutes estoppel and laches to bar the claim of termination of the Wilson lease;" (3) "The judgment of the trial court * * * is not clearly against the weight of evidence or contrary to law or established principles of equity."

In support of Point 1 above, Oil Capitol President Mr. March testified that Oil Capitol acquired the Wilson and Emerson leases in May 1962 for the primary purpose of instituting a secondary recovery program by water flooding. At this time the oil and gas leases were reaching their economic limits by primary methods. After this acquisition, Oil Capitol contacted without success several oil producers in an effort to form a co-operative water flood operation. Upon Oil Capitol's petition the Oklahoma Corporation Commission authorized a water flood operation on the Emerson and Wilson leases. Durbin Branch, a partner in the operation defaulted in his operating agreement obligations and Oil Capitol instituted lien foreclosure proceedings with the results indicated above. In the fall of 1965 Oil Capitol had conferences with petroleum engineers in Tulsa, Oklahoma.

The first knowledge Oil Capitol had that Jath Oil Company had any complaint was on August 17, 1966, following a written inquiry from Jath in May 1966. In May 1966, before receiving the Jath inquiry, Oil Capitol had commenced an injection well on the Wilson lease.

Prior to the cessation of production in February 1964, Oil Capitol proceeded with its secondary recovery plans on the Wilson and Emerson leases, starting water injection and pumping all wells located on the leases. Though not producing in paying quantities after February 1964, the Wilson lease was pumped continuously until October of 1964 at which time the central power broke down. After the power breakdown, Oil Capitol continued to inject on the Emerson lease and the pumper was instructed to put a pumping unit on the No. 8 Wilson and to also test the No. 1 Wilson which was done in December 1965. It was stated further in the brief of defendant in error "that there was no capital expense directly on the Wilson lease from about January 1964, with the exception of a little expense in December of 1964 down until April or May of 1966; the reason for no expenditures being that The Oil Capitol Corporation was unable to collect from the Branch interest but they wanted to keep the flood going and kept injecting water and had unallocated expense between the Emerson and Wilson leases during this interval."

After the Branch matter was cleared up in August of 1965, Oil Capitol resumed conferences with off-set operators and contacted a petroleum engineer in Tulsa. A drilling contractor was contacted by Oil Capitol in April 1966 for the purpose of drilling the No. 9 Wilson and a permit was filed with the Corporation Commission to drill such well on April 21. The commencement of this well was on May 5 or 6, 1966, which took only about three days to drill. After completion of the well, injec-

tion was started on the No. 9 Wilson on May 10, 1966. Thereafter a pumping unit was placed on the No. 1 Wilson, the No. 8 Wilson and the No. 1–A Wilson and all wells commenced pumping.

On Point 2 urged by defendants in error the facts are that no complaint or contact was made by Jath Oil Company concerning either the water flood operation or the cessation of production on the Wilson lease.

■ We hold that under the terms of the 1914 lease the lessor and the lessee of the Wilson lease intended that the Wilson lease terminate when the cessation in production after the primary term is for an unreasonable length of time unless Plaintiff Jath Oil Co. is estopped to assert, or is barred by laches to assert, lease termination. The intended meaning of "as much longer thereafter as oil or gas is found in paying quantities" in the habendum clause is our initial question. Both Plaintiff and Defendants correctly treat "found" in the habendum clause as synonymous with "produced." Pine v. Webster, 118 Okl. 12, 246 P. 429 (1926). The very nature of the oil and gas producing operation, considered in relation to the purpose of an oil and gas lease to portend monetary benefits to lessor and lessee, makes it clear that lessor and lessee could not have intended that the lessee, to prevent lease termination must produce every minute of every day. Continuous production may damage the oil and gas reservoir. Operating hazards or mechanical breakdowns may cause interruptions frequently.

These and other considerations have prompted us to announce the rule that a lessor and lessee did not intend that a temporary cessation of production, after the primary term, terminate the lease and that a temporary cessation is one that does not extend for an unreasonable time under the particular circumstances of each case. Cotner v. Warren, Okl., 330 P.2d 217 (1958). In Cotner a cessation of production for about six months because of dissension among the co-tenants in the lease was held to be a temporary cessation. In Cotner we relied principally on Lamb v. Vansyckle, 205 Ky. 597, 266 S.W. 253 (1924) wherein the Kentucky court held a cessation of 56 days while the lessee straightened his financial affairs was not unreasonable.

■ The facts that prompted an affirmance in Kerr v. Hillenberg, Okl., 373 P.2d 66 (1962) compel a finding in this case that a cessation of production continued for an unreasonable time. Here, as in Kerr, Oil Capitol suffered a power breakdown similar in nature. Here Oil Capitol made no effort to remedy the breakdown, ostensibly because of its foreclosure action against Branch but in Kerr the lessee Mrs. Lyons made persistent and good faith efforts to get the breakdown repaired. In Kerr the lessee made immediate efforts to negotiate for a water flood operation which were thwarted by lessor's statement to the negotiating parties that the lessee's lease had terminated. Here the delay was over two years. In Kerr the period of cessation of production could not have been more than six or twelve months, the exact time being indefinite. In Kerr we said the delay in resuming production since that time must be attributed to the conduct of plaintiffs; their denial of the validity of the leases caused the Webco offer and later the offer by Gulf, to be withdrawn. We therefore held in Kerr that the delay in resumption of production, under all the circumstances of that case, had not been for an unreasonable length of time. We have none of those circumstances in the present case.

There was no known defense to the lien foreclosure action and no reason grounded in due regard for the interest of the lessor to justify the delay in production during negotiations with and the foreclosure action against Branch. As testified by Oil Capitol's President, Mr. March, "Well, actually we suspended operations, frankly, until we knew the outcome of this law suit." From this statement it would appear that until the outcome of the action against Branch was known it was uncertain wheth-

er water flooding operations would ever be prosecuted on the Wilson lease.

It seems clear that the overriding consideration in suspending operations on the Wilson lease was the Durbin Branch default. It is quite doubtful whether the default of a ⁹⁄₁₆ operating interest is a justification for suspending operations leading to production on the Wilson lease, especially if lessee has any concern for the interests of lessor in continuing to receive royalty payments. But let it be assumed that suspending operations on the Wilson lease is justified by Branch's default, which occurred in December 1962. Oil Capitol only wished, according to the testimony of its president, to suspend operations "until we knew the outcome of this suit." There was no suggested defense to Oil Capitol's foreclosure action. Branch never filed an answer. Judgment was entered by default January 8, 1965. Having due regard for lessor's interest, there is no real reason why Oil Capitol could not have made preparation then to drill the Wilson No. 9 injection well that it drilled 16 months later. If not on January 8, 1965, why not on April 27, 1965, the day that Oil Capitol purchased Branch's interest at foreclosure sale. If not on April 27, 1965 why not June 21, 1965, the day the deficiency judgment was entered.

■ Defendants in error in their brief say that at 100 A.L.R.2d 885, 901 there is a review of various Oklahoma cases at page 901 where a delay in resumption of production was held reasonable for periods of time ranging from five months to four years. This is in error. In Beatty v. Baxter, Okl., 258 P.2d 626 (1953) there was involved the termination of a term mineral interest rather than the termination of an oil and gas lease. In that case the Court carefully pointed out that oil and gas lease cases could not be applied to term mineral interests because, in reference to provisions other than the granting clause, essentially different obligations were involved. In an oil and gas lease a construction is favored "to promote development and pro-

ductiveness." Additionally it was pointed out that scarcity of equipment in war time was a consideration. The grantee in a term mineral interest has no obligation to promote development and productiveness. In Townsend v. Creekmore-Rooney Co., Okl., 358 P.2d 1103 (1961) no question of lease termination was involved. The question was whether there was a reasonable compliance with lessee's obligation to find a market for gas well gas, an entirely different question than lease termination.

The longest period permitted in Oklahoma judicial history for temporary cessation after expiration of the primary term of an oil and gas lease was in Kerr v. Hillenberg, supra. There the time was probably six months but could not have been over 12 months.

We conclude that the cessation of production on the Wilson lease from February 1964 to July 1966, under the circumstances of this case, was cessation for an unreasonable period of time and was therefore more than a temporary cessation of production. In Hunter v. Clarkson, Okl., 428 P.2d 210, on page 213 (1967), the Court found that the cessation of production of oil for a period of six months after the expiration of the primary term was for an unreasonable length of time, and stated:

"The operator cannot, under the terms of this particular lease, only produce oil when it suits his purposes. The landowner has an interest which must, and will, be protected when the operator ceases production *for an unreasonable time,* without cause, after the expiration of the primary term."

■ The necessary finding of the trial court to the contrary was clearly against the weight of the evidence. To conclude otherwise would be in clear disregard of the interests of the lessor. A judgment in a case of equitable cognizance which is clearly against the weight of the evidence will be reversed. Bailey v. Murdock, Okl., 421 P.2d 639 (1966); Wheeler v. Brockmeier Company, Okl., 418 P.2d 693 (1961).

We turn now to the defenses urged by Defendants that Plaintiff is estopped to assert, and barred by laches to assert, that the Wilson lease has terminated because production of oil under the Wilson lease had ceased after its primary term for an unreasonable time.

It is uncontradicted in the testimony that Plaintiff did not know that production on the Wilson lease in paying quantities terminated in February 1964 and later in that year terminated altogether until the summer of 1966. Plaintiff did not know that Oil Capitol was contemplating a water flood operation on the Emerson and Wilson leases and had commenced such an operation on the Emerson lease. Additionally Plaintiff had not known until May 1966 that royalty payments had not been made since February 1964. The reason Plaintiff had not known that royalty payments from the Wilson lease had been discontinued was that Plaintiff, which is a McCasland family corporation, had turned the royalty payments over to Mrs. J. C. McCasland. Upon looking into the royalty payment matter after Mrs. McCasland's death, Plaintiff found out about the oil runs and later the cessation of production.

The July 1966 runs were returned to the Pipe Line Company for the reason Plaintiff contended the Wilson lease had terminated and had notified Defendants to this effect asking for a release of the Wilson lease. Mr. Maurer, the president of Plaintiff Oil Company, had been out on the Wilson lease in the summer of 1966, observed an injection well or two but was not certain of their location and that injection was taking place somewhere on either the Wilson or the Emerson leases. From February 1964 until May 1966 Plaintiff had not made any demand or inquiry of the Defendant Oil Capitol Corporation concerning the Wilson lease. Mr. Maurer learned of this extended cessation of production in May 1966, when he wrote Oil Capitol a letter asking about operations on the lease. Oil Capitol responded saying that no oil had been run on the Wilson

lease since October 1964; that Oil Capitol had been flooding the Emerson lease and on May 10, 1966 had drilled an injection well on the Wilson lease.

We do not see any basis for a finding of estoppel. Defendant Oil Capitol, the operating lessee, is possessed with knowledge of its own operations and knew there had been no production on the Wilson lease for over two years. This operating history occurred without any contact with Plaintiff Jath Oil Company. "It is * * * essential that the party alleging estoppel must prove that he did not know the truth. A party acquainted with the facts when the alleged misleading conduct took place cannot assert an estoppel based upon such conduct." Gypsy Oil Company v. Marsh, 121 Okl. 135, 248 P. 329 (1926). In Gypsy the execution of a division order making a contrary to fact representation did not work an estoppel because Gypsy knew the facts. Here Oil Capitol knew the facts concerning the cessation of production on the Wilson lease. Plaintiff was cognizant of none of them until after their occurrence.

In Gypsy the contest was between two lessees, Gypsy and Marsh. If Gypsy were producing oil in paying quantities, its lease had not terminated and Marsh's lease under the contractual arrangements would not become effective. At the end of the primary term, December 15, 1922, no oil had been run from the lease. Nevertheless on that date, the lessor Moyer had executed a division order that certified that Gypsy and Moyer were the owners of the leasehold and Gypsy contended that Moyer was estopped to contend otherwise and this estoppel operated against Marsh, the subsequent lessee. Gypsy knew that it had not discovered a paying well. Moyer was not in possession of this knowledge when he signed the division order. We held that Moyer and Marsh were not estopped on the basis of the following tests:

"The essential elements of an 'equitable estoppel' are: First, there must be a false representation or concealment of

facts. Second, it must have been made with knowledge, actual or constructive, of the real facts. Third, the party to whom it was made must have been without knowledge, or the means of knowledge, of the real facts. Fourth, it must have been made with the intention that it should be acted upon. Fifth, the party to whom it was made must have relied on or acted upon it to his prejudice. The representation or concealment, mentioned, may arise from silence of a party under imperative duty to speak; and the intention that the representation or concealment be acted upon may be inferred from circumstances."

We have recently applied these essential elements in reversing a judgment involving laches, Bailey v. Murdock, Okl., 421 P.2d 639 (1966), and estoppel, Wheeler v. Brockmeier Company, Okl., 418 P.2d 693 (1961).

With respect to the long cessation of production, there was, without question, no previous representation by lessor plaintiff that Oil Capitol's contemplated cessation of production was satisfactory to Plaintiff. As lessor, Plaintiff was under no duty to lessee to acquaint lessee with its own operations. Here during the extended cessation of production there were no royalty payments made or acceptance of benefits by Plaintiff, and in fact royalty payments finally made in July 1966 were returned. Conversely, in Woodruff v. Brady, 181 Okl. 105, 72 P.2d 709 (1937) we held the mere acceptance and retention by lessor of royalties produced under an oil and gas lease which has expired by reason of the failure of the lessee to produce oil or gas in paying quantities, are insufficient to work estoppel against lessor to assert the expiration of said lease in an action to quiet title as against the same. There can not conceivably be an obligation on the lessor to tell the lessee that lesssee has ceased to produce oil when the lessee is the only one that knows about it. One cannot be silent about something he knows nothing about and is under no obligation to find

out. Sarkeys v. Russell, Okl., 309 P.2d 723 (1957).

Defendant's position concerning the issue of laches appears to be that Plaintiff during the long period of cessation of production from February 1964 to July 1966, should have instituted this action based upon lease termination; that since Plaintiff was in the oil producing business with its principal office in Stephens County, Plaintiff must have known about the cause of the delay in production, and that Oil Capitol for the assigned reasons had decided to suspend water flood operations on the Wilson lease. No move was ever made by Oil Capitol to inform Jath Oil Company of its problems concerning the Wilson lease. The fact still remains undisputed that Plaintiff Jath Oil Company did not learn of failure to produce and the assigned reasons for the failure until May 1966. It did not constitute laches to delay from May 1966 until August 1966 to institute this action to quiet title based on the alleged termination of the Wilson lease.

"No cases have been found in which the court has found that the doctrine of laches is a defense to the lessor's claim that a lease has terminated pursuant to the special limitation in the habendum clause. Since termination of a lease by operation of the limitation provision of the habendum clause is automatic, the lessor's delay in bringing suit appears immaterial. Any defense that the lessor has waived his right to assert termination of the lease would seem inapplicable." 3 Williams & Meyers, Oil and Gas Law, § 604.7.

We reverse the judgment of the trial court. We hold that the Wilson lease has terminated and render judgment for Plaintiff Jath Oil Company quieting its title against the claims of all Defendants under the Wilson lease.

DAVISON, V. C. J., and BLACKBIRD, HODGES and LAVENDER, JJ., concur.

BERRY, C. J., and WILLIAMS, JACKSON and IRWIN, JJ., dissent.