[Cite as *RHDK Oil & Gas, L.L.C. v. Dye*, 2016-Ohio-4654.]

STATE OF OHIO, HARRISON COUNTY

IN THE COURT OF APPEALS

SEVENTH DISTRICT

RHDK OIL AND GAS LLC )  CASE NO. 14 HA 0019
dba RED HILL DEVELOPMENT, )
)
PLAINTIFF-APPELLEE )
)
VS. )  OPINION
)
WILLIAM A. DYE, et al., )
)
DEFENDANTS-APPELLANTS )

CHARACTER OF PROCEEDINGS:   Civil Appeal from the Court of Common
Pleas of Harrison County, Ohio
Case No. CVH-2012-0069

JUDGMENT:   Affirmed.

APPEARANCES:
For Plaintiff-Appellee:   Atty. Owen J. Rarric
Atty. Matthew W. Onest
Krugliak, Wilkins, Griffiths
  & Doughtery Co., LPA
4775 Munson St. NW
P.O. Box 36963
Canton, Ohio  44735-6963

For Defendants-Appellants:   Atty. Robert M. Owens
Owens Law Office
46 North Sandusky Street, Suite 202
Delaware, Ohio  43015

JUDGES:

Hon. Cheryl L. Waite
Hon. Gene Donofrio
Hon. Carol Ann Robb

Dated:  June 20, 2016

WAITE, J.

{¶1} In this action involving an oil and gas lease, Appellants William A. Dye et al. ("the Dye family") appeal the Harrison County Common Pleas Court's decision to grant summary judgment in favor of Appellees RHDK Oil & Gas, LLC ("RHDK"). The Dye family argues that the lease terminated on its own terms due to a lack of production, thus the trial court erroneously granted summary judgment in RHDK's favor as to the following claims: quiet title, breach of contract, conversion, declaratory judgment, negligent maintenance, and trespass. For the reasons provided, the Dye family's arguments are without merit and the judgment of the trial court is affirmed.

## Factual and Procedural History

{¶2} On January 8, 1980, the Cramblett family entered into an oil and gas lease with Floyd Kimble. The lease covered approximately 288 acres of land located in North Township, Harrison County. The lease contained a two-tiered habendum clause. The lease also contained a provision that allowed the Cramblett family free gas for one residence.

{¶3} On September 3, 1982, a well was drilled on the property. The well produced both oil and gas. In accordance with the lease, a small house on the Cramblett property began receiving free gas. In addition to the free gas, Kimble began sending royalty payments to the Cramblett family. The well produced consistently until 1990 when the production records show no production of either gas or oil for six consecutive months. The parties dispute whether oil was produced and collected in the tank during this period. After the six-month period, production

records show that the well resumed production of both oil and gas. In 1991, the records reflect a second period of five months without production. The well apparently resumed production until 1996, where the records indicate another six-month period of nonproduction.

{¶4} In 1994, the Dye family obtained 252 acres of Cramblett property. Shortly thereafter, the Dye family built a larger home and a shed, which was used for commercial purposes. Although the lease terms allowed only one residence to receive free gas, the Dye family hooked up both new buildings to the unmetered gas line without informing Kimble.

{¶5} On October 6, 2009, the estate of Floyd Kimble assigned the lease to RHDK. Shortly thereafter, RHDK began sending royalty checks to the Dye family. Despite receiving checks from RHDK for the next three years, on January 4, 2012, the Dye family sent Kimble notice of forfeiture pursuant to R.C. 5301.332. However, the notice did not conform to the requirements of R.C. 5301.332. Two months later, the Dye family recorded an affidavit of forfeiture, which was also defective. Shortly thereafter, the Dye family physically blocked RHDK's access to the well.

{¶6} The Dye family's actions caused RHDK to file a complaint and motion for a temporary restraining order. On August 7, 2012, the trial court granted RHDK's motion for a temporary restraining order. In accordance with the restraining order, RHDK paid a $10,000 bond. In its declaratory judgment complaint, RHDK alleged breach of contract and slander of title, and sought quiet title and injunctive relief. The complaint was later amended to add claims of trespass, negligence, conversion,

accounting, and unjust enrichment. The Dye family filed a counterclaim alleging trespass and negligent maintenance of property. Both parties filed respective motions for summary judgment.

**{¶7}** On June 10, 2014, the trial court granted summary judgment in favor of RHDK on its breach of contract, quiet title, conversion action, granted declaratory judgment and granted judgment on all of the Dye's counterclaims. A damages hearing was scheduled, however, the parties stipulated to damages. This timely appeal followed.

<u>Summary Judgment</u>

**{¶8}** Each of the Dye family's assignments of error challenges the trial court's decision to grant summary judgment in favor of RHDK. A trial court's decision to grant summary judgment is reviewed *de novo* using the same standard as the trial court set forth in Civ.R. 56(C). *Haney v. Barringer*, 7th Dist. No. 06 MA 141, 2007-Ohio-7214, ¶ 33, citing *Grafton v. Ohio Edison Co.*, 77 Ohio St.3d 102, 105, 671 N.E.2d 241 (1996). Pursuant to Civ.R. 56(C), the movant must demonstrate that: (1) no genuine issue as to any material fact remains to be litigated; (2) the moving party is entitled to judgment as a matter of law; and (3) it appears from the evidence that reasonable minds can come to but one conclusion, and viewing the evidence most favorably for the party against whom the motion for summary judgment is made, the conclusion is adverse to that party. If this burden is met, the non-movant has a reciprocal burden and must set forth specific facts demonstrating that there is a genuine issue of material fact. Civ.R. 56(C).

**{¶9}** A court must consider the evidence and all reasonable inferences to be drawn in a light most favorable to the non-movant. *Dennison Bridge, Inc. v. Resource Energy, L.L.C.*, 7th Dist. No. 14 HA 21, 2015-Ohio-4736, ¶ 17-18, citing *Jackson v. Columbus*, 117 Ohio St.3d 328, 2008-Ohio-1041, 883 N.E.2d 1060, ¶ 11. The court must resolve any doubts in the non-movant's favor and "may not weigh the proof or choose among reasonable inferences." *Dennison* at ¶ 18, citing *Leibreich v. A.J. Refrig., Inc.*, 67 Ohio St.3d 266, 269, 617 N.E.2d 1068 (1993); *Dupler v. Mansfield Journal Co.*, 64 Ohio St.2d 116, 121, 413 N.E.2d 1187 (1980).

<u>First Assignment of Error</u>

THE COURT ERRED IN ENTERING SUMMARY JUDGMENT IN FAVOR OF THE APPELLEE ON ITS QUIET TITLE CLAIM, BECAUSE THE RECORD CONTAINED EVIDENCE SHOWING THAT THE MINERAL-RIGHTS LEASE IN QUESTION HAD TERMINATED UNDER ITS OWN TERMS.

**{¶10}** The Dye family contends that the lease terminated under its own terms, thus the trial court erred in granting summary judgment to RHDK in regard to the quiet title claim. The Dye family asserts that there were three significant periods during the secondary term where the well failed to produce either oil or gas: December of 1989 to May of 1990, February of 1991 to June of 1991, and January of 1996 to June of 1996. As the well failed to produce during these periods, the Dye family contends that the lease terminated in accordance with the habendum clause.

**{¶11}** In the alternative, the Dye family argues that a lack of production in paying quantities is evident in this case. Although the trial court determined that the well produced sufficient volumes of oil and gas, the Dye family argues that the court never addressed the value of the oil and gas the well produced.

**{¶12}** In response, RHDK argues that the only evidence of non-production pertains to a temporary cessation that occurred twenty years ago. Although RHDK concedes a temporary cessation of no more than six months took place, it argues that this cessation applied only to gas production. RHDK says that there has never been a period of time where neither oil nor gas was produced. As the well was producing either oil or gas at all times, RHDK contends that the conditions necessary to extend to the secondary term have been satisfied.

**{¶13}** As to the issue of paying quantities, RHDK points out that the lease requires production in paying quantities "in the judgment of the lessee." (Appellee's Brf., p. 13.) As such, RHDK only needed to show there was production of oil or gas and that it made a good faith determination that the well remains profitable. RHDK argues that the production report shows that oil or gas was produced every year from 1983 to 2012. As to profitability, RHDK argues that it provided two affidavits which state its reasonable and good faith belief that the well remains profitable.

**{¶14}** The lease at issue contains a two-tiered habendum clause. The habendum clause provides that the lease:

[S]hall continue in force and the rights granted hereunder be quietly enjoyed by the Lessee for a term of three years and so much longer

thereafter as oil or gas or their constituents shall be found on the premises in paying quantities in the judgment of the Lessee or as the premises shall be operated by the Lessee in the search for oil or gas.

(1/8/1980 Lease, ¶3.)

**{¶15}** At issue, here, is whether the well continuously produced gas or oil in paying quantities during the secondary term. The well was drilled in 1983, eight months before the primary term ended. The production report shows that the well has produced gas during every year from 1983 until this action was filed in 2012. The production report shows that oil was additionally produced from the well. However, it is unclear whether the recorded oil production reflects a monthly measurement or a pickup measurement. There are three cessation periods where the production report reflects that neither oil nor gas was produced: December of 1989 to May of 1990, February of 1991 to June of 1991, and January of 1996 to June of 1996. None of these periods exceeded six months.

**{¶16}** We begin with RHDK's argument that either oil or gas was produced at all times since the well was drilled. Importantly, according to the habendum clause, a well need only produce oil *or* gas, not both. *Mobberly v. Wade,* 7th Dist. No. 13 MO 18, 2015-Ohio-5287, 44 N.E.3d 313. RHDK argues that, unlike gas, oil is produced over time and collects in a tank until it reaches a certain volume. At that point, the oil is removed from the tank and is sold. Accordingly, RHDK argues that even though oil production was not recorded each month, the well was producing oil which was building up in the tank until enough was collected to schedule a pickup.

{¶17} In *Mobberly,* we held that a lessee who presented evidence that he regularly measured the oil in the tank to determine when to call for pickup had demonstrated production. The lessee charted these measurements in handwritten production reports. In addition to the production report, the lessee also presented the following evidence: receipts which indicated the date the oil was picked up, the tank number the oil was taken from, the amount of oil removed from the tank, and the lessor's corresponding royalties.

{¶18} RHDK has failed to present such evidence, here. Although RHDK argues that the oil collects in the tank until a specific volume is reached, unlike the lessee in *Mobberly* RHDK has not presented any evidence as to how much oil collects before pickup is scheduled. The lack of evidence is significant in our case, as oil production has been recorded as low as 22.9 barrels and as high as 124 barrels. In fact, RHDK has presented no evidence to support its argument that oil was being produced during the cessation periods other than a statement that oil generally collects in a tank over time. As RHDK has not shown production of oil during the cessation periods, we must decide whether the cessation periods terminated the lease.

{¶19} To determine this issue, we first look to whether the cessation period was temporary or permanent. Preliminarily, we note that the Dye family argues that the determination of whether a cessation period is temporary or permanent is a question of fact reserved for a jury. However, we recently held that this issue

involves a legal question when reasonable minds could not differ based on the evidence presented. See *Dennison, supra.*

**{¶20}** Although both parties cite to caselaw from other states, Ohio appellate courts, including this Court, have already addressed the issue. The Fifth District provided the general rule in *Wagner v. Smith,* 8 Ohio App.3d 90, 92, 456 N.E.2d 523 (5th Dist.1982). In *Wagner,* the court acknowledged that:

Courts universally recognize the proposition that a mere temporary cessation in the production of a gas or oil well will not terminate the lease under a habendum clause of an oil and gas lease where the owner of the lease exercises reasonable diligence and good faith in attempting to resume production of the well.

**{¶21}** The court stated that "[a] critical factor in determining the reasonableness of the operator's conduct is the length of time the well is out of production." *Id.* at 93*,* citing *Jath Oil Co. v. Durbin Branch*, 490 P.2d 1086 (Okl.1971). In addition to the length of time, a court must consider all attendant circumstances. *Id.,* citing *Barrett v. Dorr*, 140 Ind.App. 295, 212 N.E.2d 29 (1966).

**{¶22}** According to *Wagner,* the primary factor to consider is the length of the cessation. Here, there are three periods of nonproduction, none of which lasted more than six months. No case can be found where an Ohio appellate court deemed a lease forfeited based on less than two years of nonproduction. See *Casto v. Positron Energy Resources, Inc.*, 4th Dist. No. 14 CA 39, 2016-Ohio-285 (seven years of nonproduction during the secondary term resulted in termination of the

lease); *Schultheiss v. Heinrich Ents. Inc.*, 4th Dist. No. 15 CA 20, 2015-Ohio-121 (four years of nonproduction during the secondary term resulted in termination of the lease); *Lauer v. Positron Energy Resources*, 4th Dist. No. 13 CA 39, 2014-Ohio-4850 (two years of nonproduction during the secondary term resulted in termination of the lease); *Moore v. Adams*, 5th Dist. No. 2007AP090066, 2008-Ohio-5953 (six years of nonproduction during the secondary term resulted in termination of the lease); *Tisdale v. Walla*, 11th Dist. No. 94-A-0008, 1994 WL 738744 (Dec. 23, 1994) (twenty plus years of nonproduction during the secondary term resulted in termination of the lease); *Hanna v. Shorts*, 163 Ohio St. 44, 125 N.E. 338 (1955) (the well failed to produce any oil or gas during the secondary term).

**{¶23}** The *Wagner* court stated "that while courts tend to hold the cessation of production temporary when the time periods are short, lessees have, for the most part been held not to have proceeded diligently when the cessation from production exists for two years or more." *Wagner, supra,* at 94. The court relied on an Oklahoma case, *Jath*, *supra*. *Jath* held forfeiture of a lease proper where a cessation period lasted two years. The court distinguished its cessation period from the six-month cessation period found in its earlier case, *Kerr v. Hillenberg,* 373 P.2d 66 (Okl.1962), which was not "more than six or twelve months." *Jath* at 1090, citing *Kerr.*

**{¶24}** While we held in *Dennison, supra,* that there is no bright line rule in regard to cessation periods, the caselaw indicates that absent a finding of unreasonableness, a six-month cessation period is temporary and does not terminate

a lease. Accordingly, we next address the reasonableness of RHDK's actions. Importantly, the Dye family has not argued that RHDK failed to take reasonable actions to resume production after the cessation periods. Even so, we find that the record shows that RHDK's actions were reasonable.

{¶25} Generally, when we analyze reasonableness, we consider whether the lessee made a timely effort to resume production of the well. The question becomes more difficult in this matter, as the lease was not assigned to RHDK until 2009, well after all three cessation periods. Hence, we look to the reasonableness of RHDK's predecessor, Mr. Kimble. Further complicating our review, RHDK's predecessor is deceased. Likely for these reasons, RHDK has not provided an explanation as to what caused the cessation periods.

{¶26} While RHDK does not provide a specific explanation, it notes that there are always inevitable cessations in production for several reasons, including mechanical breakdowns, market conditions, reworking operations, and other problems. 3 Williams & Myers, *Oil & Gas Law,* Section 604.4, at 61 (2012). Among the "other problems" in this case may have been weather-related issues. The cessation periods include the following months: January, February, March, and April. The monthly production average of these months from 1983 until 2012 is approximately half the averages of the remaining months.

{¶27} In addition to potential weather-related problems, a daily production report shows that maintenance has been periodically performed on the well. Some of the problems the wells have experienced include line and drip issues, a leaking tank,

valve issues, tubing gauge issues, and battery problems. Although the report only provides maintenance records from 2005 through 2012, it is clear from this report that the well periodically required maintenance. Based on the record, there is no evidence that Kimble acted unreasonably.

**{¶28}** The Dye family argues that even if the cessation periods did not cause the lease to terminate, the well has not been producing in paying quantities. The habendum clause requires production in paying quantities. The term "paying quantities" has been defined as the production of "quantities of oil or gas sufficient to yield a profit, even small, to the lessee over operating expenses, even though the drilling costs, or equipping costs, are not recovered, and even though the undertaking as a whole may thus result in a loss." *Blausey v. Stein,* 6th Dist. No. OT-78-3, 1978 WL 214959 (Dec. 8, 1978).

**{¶29}** The habendum clause in this case requires "paying quantities in the judgment of the Lessee." (1/8/1980 Lease, ¶3.) We note that this language provides the lessee even more discretion in judgment than that already given within the "paying quantities" standard. Consistent with this discretion, RHDK provided two affidavits from its employees. In these affidavits, the affiants stated their reasonable and good faith belief that the well remained profitable.

**{¶30}** In addition, RHDK presented evidence of royalty payments. While not conclusive evidence, royalty payments can be evidence of production in paying quantities. See *Price v. K.A. Brown Oil & Gas, LLC,* 7th Dist. No. 13 MO 13, 2014-Ohio-2298 (the failure to pay royalties or the payment of *de minimum* royalties is

evidence of nonproduction); *Bohlen v. Anadarko E&P Onshore LLC,* 4th Dist. No. 14 CA 13, 2014-Ohio-5819 (the fact that production has resulted in royalty payments is evidence of production in paying quantities).

**{¶31}** Here, RHDK produced evidence of royalties paid from 2010 through the end of 2011. In 2010, RHDK sent the Dye family five checks: $43.62 on 2/28/2010; $45.00 on 4/30/2010; $27.29 on 6/30/2010; $36.14 on 9/30/2010; and $18.14 on 12/31/2010. These five checks totaled $170.19. In 2011, RHDK sent the Dye family five more checks: $33.89 on 3/31/2011; $645.68 on 4/30/11; $30.62 on 6/30/2011; $29.98 on 9/29/2011; and, $18.98 on 12/31/2011. These royalties totaled $759.15. The 2010 and 2011 royalty payments represent a significantly higher production than the $68.59 produced in *Price*, which was found to be *de minimus.*

**{¶32}** However, a problem arises when looking at 1983 through 2009, as the parties have not submitted evidence of royalty checks. Again, this is likely because RHDK did not have an interest in the lease during this period and its predecessor died before the assignment to RHDK was made. However, Rosemary Dye stated in her deposition that she has been cashing royalty payments since at least 1994, which is when the Dye family obtained an interest in the property. In her deposition, Mrs. Dye described these royalty checks as "enormous." (Rosemary Dye Depo., p. 84.) Again, while royalties are not conclusive evidence of production, they tend to confirm RHDK's affidavits which assert a good faith belief that the well remains productive. The lease has not, then, terminated.

**{¶33}** Taking all evidence within the record into consideration, we find that the trial court correctly granted summary judgment in RHDK's favor on the quiet title claim. The Dye family's first assignment of error is without merit and is overruled.

<u>Second Assignment of Error</u>

THE COURT ERRED AS A MATTER OF LAW BY ENTERING SUMMARY JUDGMENT IN FAVOR OF THE APPELLEE ON ITS BREACH OF CONTRACT CLAIM RULING THAT THE MINERAL RIGHTS LEASE WAS STILL VALID BECAUSE EVIDENCE OF THE WELL'S FAILURE TO PRODUCE REQUIRED TERMINATION OF THE LEASE.

**{¶34}** To prove a breach of contract, a plaintiff must "demonstrate by a preponderance of the evidence (1) that a contract existed, (2) that the plaintiff fulfilled his obligations, (3) that the defendant failed to fulfill his obligations, and (4) that damages resulted from this failure." *Moore, supra,* at ¶ 22, citing *Circuit Solutions, Inc. v. Mueller Electric Company*, 9th Dist. No. 07CA009139, 2008-Ohio-3048; *Farmers Market Drive–In Shopping Centers v. Magana*, 10th Dist. No. 06AP–532, 2007-Ohio-2653.

**{¶35}** The Dye family argues that a valid lease must exist before a court can find a breach. The Dye's alleged breach in this case is their addition of two gas lines, including one to a commercial building, resulting in free gas for three buildings. The Dye family argues that the court erred in finding they breached the lease as the lease is invalid due a lack of production in paying quantities.

**{¶36}** In response, RHDK contends that the lease remains valid as it is held by production. Additionally, RHDK asserts that the Dye family's use of free gas was a benefit gained from an express term of the lease. As the Dye family continued to take advantage of a lease term, RHDK argues that the Dye family acted as if a valid lease existed.

**{¶37}** We note that the Dye family solely contests the validity of the lease and does not argue that their use of free gas for three structures does not constitute a breach. As we have determined that the lease is valid, the Dye family's arguments have no merit. Accordingly, the Dye family's second assignment of error is overruled.

<u>Third Assignment of Error</u>

THE COURT ERRED AS A MATTER OF LAW IN ENTERING SUMMARY JUDGMENT IN FAVOR OF THE APPELLEE ON ITS CONVERSION CLAIM, BECAUSE THE GENUINE ISSUES OF MATERIAL FACT EXISTED AS TO WHICH PARTY HELD TITLE TO THE MINERAL RIGHTS AND BECAUSE THE APPELLEE'S CLAIM WAS BARRED BY THE DOCTRINE OF LACHES.

**{¶38}** "Conversion is an exercise of dominion or control wrongfully exerted over property in denial of or under a claim inconsistent with the rights of another." *Keybank Natl. Assoc. v. Guarnieri & Seacrest, PLL,* 7th Dist. No. 07 CO 46, 2008-Ohio-6362, ¶ 15, citing *Joyce v. Gen. Motors Corp.*, 49 Ohio St.3d 93, 96, 551 N.E.2d 172 (1990); *Union Sav. Bank v. White Family Cos., Inc.*, 167 Ohio App.3d 51, 2006-Ohio-2629, 853 N.E.2d 1182, (2d Dist.) ¶ 26. The elements of conversion are "(1)

plaintiff's ownership or right to possession of the property at the time of the conversion; (2) defendant's conversion by a wrongful act or disposition of plaintiff's property rights; and (3) damages." *Keybank* at ¶ 15*, citing *Haul Transport of VA, Inc. v. Morgan*, 2d Dist. No. 14859, 1995 WL 328995 (June 2, 1995).

**{¶39}** The Dye family continues to argue that the lease terminated as the well failed to produce oil or gas in paying quantities. They contend that termination of the lease caused ownership of the mineral rights to revert back to them as the owners of the property. As the Dye family believes they owned the mineral rights because the rights reverted to them, they argue that RHDK cannot meet the first element of conversion, which requires ownership or interest in the property and actual or constructive possession or immediate right to possession of the property.

**{¶40}** RHDK responds that the lease is valid and is held by production. The lease restricted the Dye family's use of gas to one residential structure. As the Dye family received free gas for more buildings than it was entitled to receive, RHDK argues that the trial court properly granted its motion for summary judgment on the conversion claim.

**{¶41}** As we have determined that the lease remains valid, the Dye family's arguments are without merit. They alternately argue that RHDK's conversion claim is barred by laches. The elements of laches are: "(1) unreasonable delay or lapse of time in asserting a right, (2) absence of an excuse for the delay, (3) knowledge, actual or constructive, of the injury or wrong, and (4) prejudice to the other party." *In re Guardianship of Mull*, 7th Dist. No. 15 BE 11, 2015-Ohio-5440, ¶ 68, citing *State*

*ex rel. Craig v. Scioto Cty. Bd. of Elections*, 117 Ohio St.3d 158, 2008-Ohio-706, 882 N.E.2d 435, ¶ 11, quoting *State ex rel. Polo v. Cuyahoga Cty. Bd. of Elections*, 74 Ohio St.3d 143, 145, 656 N.E.2d 1277 (1995).

**{¶42}** The Dye family also argues there was an unreasonable delay in asserting the conversion claim, as RHDK waited eight years after their multiple structures were added to the gas line to raise this claim, there was no excuse for the delay, and RHDK undertook monthly meter readings and supposedly conducted regular maintenance and must have had constructive notice of the alleged wrong. The Dyes also claim the delay had a prejudicial effect on them as the lump sum damages are significant.

**{¶43}** RHDK argues that mere delay in bringing a claim does not constitute laches because the standard requires that the delay was "unreasonable." RHDK says that the delay here was reasonable as it did not learn the Dyes connected multiple structures to the free gas line until discovery began. Regardless, RHDK contends that the Dye family was required to demonstrate material prejudice, a standard which is met only by showing actual proof that evidence was lost or they suffered a detriment. The Dye family has shown neither that evidence was lost nor detrimental effect. RHDK contends that the lump sum damage award, while large, is not considered a "detriment" for these purposes.

**{¶44}** The record does not support the Dye family's arguments as to laches. There is no evidence that RHDK had actual or constructive knowledge of the Dye's additional gas usage. The Dye family admits that they did not seek permission from

Kimble before adding two other buildings to the unmetered gas line and never informed Kimble or RHDK of the additional lines.

**{¶45}** There is also no evidence of an unreasonable delay. The record shows that RHDK did not learn of the additional gas lines until discovery was undertaken in this case. Shortly thereafter, RHDK amended its complaint to raise the conversion claim. As RHDK amended its complaint as soon as it gained knowledge of the conduct, any delay in bringing the claim was reasonable. Finally, a valid lump sum judgment, alone, is insufficient to show material prejudice. *Smith v. Smith,* 168 Ohio St. 447, 457, 156 N.E.2d 113 (1959). As the Dye family's sole argument in support of laches is the size of the valid lump sum damage award, they cannot show material prejudice. Accordingly, the Dye family's third assignment of error is without merit and is overruled.

<u>Fourth Assignment of Error</u>

THE COURT ERRED AS A MATTER OF LAW IN ENTERING SUMMARY JUDGMENT IN FAVOR OF THE APPELLEE ON ITS CLAIM FOR DECLARATORY JUDGMENT, BECAUSE GENUINE ISSUES OF MATERIAL FACT EXISTED AS TO WHICH PARTY HELD TITLE TO THE MINERAL RIGHTS IN QUESTION.

**{¶46}** Based on their belief that the well is not producing, the Dye family argues the trial court erroneously determined that R.C. 5301.332 is inapplicable. In response, RHDK points out that the Dye family admits that their R.C. 5301.332

affidavit of forfeiture is non-conforming. Regardless, the evidence shows that the well has been producing since 1983.

**{¶47}** Pursuant to R.C. 5301.332(A)(1):

Whenever leases of natural gas and oil lands recorded under section 5301.09 of the Revised Code concerning lands upon which there are no producing or drilling oil or gas wells become forfeited for failure of the lessee or the lessee's successors or assigns to abide by specifically described covenants provided for in the lease, or because the term of the lease has expired, the lessor or the lessor's successors or assigns may file for record an affidavit of forfeiture with the county recorder after serving notice by certified mail, return receipt requested, to the lessee or the lessee's successors or assigns, at the lessee's or the lessee's successors' or assigns' last known address, or if service is not obtained by certified mail, by giving notice by publication at least once in a newspaper of general circulation in the county in which the land is located of the lessor's intent to declare the lease forfeited.

**{¶48}** In order to declare the lease forfeited pursuant to R.C. 5301.332, the Dye family was required to show lack of production. As the record shows that the well is producing in paying quantities, the Dye family's fourth assignment of error is without merit and is overruled.

<u>Fifth Assignment of Error</u>

THE COURT ABUSED ITS DISCRETION IN ENTERING SUMMARY JUDGMENT IN FAVOR OF THE APPELLEE ON THE APPELLANT'S NEGLIGENT MAINTENANCE CLAIM, BECAUSE ITS JUDGMENT WAS COMPLETELY UNSUPPORTED BY THE RECORD.

**{¶49}** The Dye family contends that RHDK has failed to perform any maintenance on the well from the time it was built in 1983 until this action was filed. They argue that they presented evidence that the well suffered from gas leaks and valve corrosion, and that RHDK failed to establish and maintain a corrosion-control plan. The Dye family argues that the trial court improperly relied on production reports produced by RHDK which noted various maintenance attempts.

**{¶50}** RHDK responds that the Dye family failed to timely and properly raise this issue to the trial court. As such, this issue was not considered during summary judgment. RHDK also argues that the only evidence of negligent maintenance was in failing to paint the pipeline and lack of a corrosion-control plan. RHDK argues, however, that these issues do not affect the lease, but are governed by a separate easement. RHDK also argues that it presented evidence to show the well had been properly maintained. Two experts addressed this issue, including an ODNR inspector, who examined the well and determined it was in proper condition. RHDK also asserts it presented production reports which detailed and provided dates for all maintenance performed.

**{¶51}** Despite RHDK's assertion, the trial court did address and rule on this issue during summary judgment. In finding that RHDK properly maintained the well,

the court relied on the production report, which included maintenance work performed on the well. The production report covers the entire period of time RHDK held an interest in the property. The report shows that various maintenance was performed almost daily.

**{¶52}** The Dye family argues that the work noted on the production report does not qualify as maintenance. However, it is clear that this work can be classified as maintenance. For instance, RHDK spent significant time working on the drip line, fixing tubing leaks, changing fluids, changing batteries, and installing tubing gauges. The sole evidence presented by the Dye family to refute this evidence is an expert's report which found a gas leak around a valve caused by rust. However, at the time of the expert's visit to the property, RHDK was in the process of repairing this problem. As noted in the report prepared by the Dye family's expert, significant efforts were taken to successfully remove and replace this valve. Accordingly, the record demonstrates that RHDK has been performing maintenance on the well and there is nothing within the record showing failure to properly maintain. As such, the Dye family's fifth assignment of error is without merit and is overruled.

<u>Sixth Assignment of Error</u>

THE COURT ERRED AS A MATTER OF LAW BY ENTERING SUMMARY JUDGMENT IN FAVOR OF THE APPELLEE ON THE APPELLANT'S TRESPASS CLAIM, BECAUSE GENUINE ISSUES OF MATERIAL FACT EXISTED REGARDING THE APPELLEE'S RIGHT TO ENTER THE APPELLANT'S LAND.

**{¶53}** In their final argument, the Dye family argues RHDK's entrance onto the property is unauthorized, again because they believe that the lease has terminated by lack of production. RHDK again responds by arguing that the lease remains valid and it is entitled to access the land.

**{¶54}** To state a cause of action in trespass a property owner must prove two essential elements: (1) an unauthorized intentional act, and (2) an intrusion that interferes with the owner's right of exclusive possession of their property. *Merino v. Salem Hunting Club*, 7th Dist. No. 07 CO 16, 2008-Ohio-6366, ¶ 41, citing *Brown v. Scioto Cty. Bd. of Commrs.*, 87 Ohio App.3d 704, 717, 622 N.E.2d 1153 (4th Dist. 1993).

**{¶55}** The sole issue in dispute here is whether RHDK's entrance on the property was unauthorized. As the lease is valid, RHDK's entrance on the property is authorized. As such, the Dye family's sixth assignment of error is without merit and is overruled.

Conclusion

**{¶56}** The Dye family contends that the lease terminated on its own terms due to a lack of production, thus the trial court erroneously granted summary judgment in RHDK's favor. The record demonstrates that the well has produced in paying quantities, except for three temporary cessations. As these cessations did not terminate the lease, the Dye family's arguments are without merit and the judgment of the trial court is affirmed.

Donofrio, P.J., concurs.

Robb, J., concurs.